45103, 45125. HAWES, Commissioner v. CUSTOM CANNERS, INC.; and vice versa.

ARGUED FEBRUARY 3, 1970—DECIDED FEBRUARY 16, 1970.

Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, William L. Harper, Assistant Attorney General, Timothy J. Sweeney, Deputy Assistant Attorney General, for appellant.

Terry P. McKenna, Paul L. Hames, Jack Adams, for appellee.

EBERHARDT, Judge. The sole issue in this appeal is whether the six items, or any of them, qualify for the exemption from sales and use tax under Code Ann. § 92-3403a C2 (n) (2), which provides an exemption when "the sale of machinery which is used *directly* in the manufacture of tangible personal property when such machinery is incorporated, as additional machinery, for the first time into a manufacturing plant presently existing in this State; Provided, the acquisition of such machinery results in a substantial increase in the productive capacity of such plant." (Emphasis supplied). It is conceded that the several items all qualify otherwise for the exemption.

What is meant by the phrase *used directly in the manufacture* of tangible personal property? This particular provision of the Sales and Use Tax Act has not been interpreted by our courts. We must keep in mind that in interpreting provisions of a tax law by which exemptions are provided we must resolve all doubts in favor of the taxing authority. *Cherokee Brick &c. Co. v. Redwine*, 209 Ga. 691 (75 SE2d 550); *Oxford v. J. D. Jewell, Inc.*, 215 Ga. 616, 619 (112 SE2d 601). A similar provision (§ 3(c)2 of the Act of 1951) exempting industrial materials

"used directly in the fabricating, converting, or processing of articles of tangible personal property or parts thereof for resale" was dealt with in *State of Ga. v. Cherokee Brick &c. Co.*, 89 Ga. App. 235 (79 SE2d 322), where we held that "flaming natural or artificial gas used to produce heat, which produces physical and chemical changes in the raw materials used to produce brick and clay products, is not directly used in the fabricating, converting, or processing of those products" within the meaning of that provision of the Act, and that the gas was subject to the tax.

Property which is manufactured for resale is not subject to the tax. It was conceded in that case that the gas did not become a component part of the finished product. If it had done so the exemption would have been applicable. Whether the gas was exempt, then, depended upon the matter of whether it was used *directly* in manufacturing. Analogizing the use of gas as an energy source to the use of electricity as an energy source for driving machinery in the manufacturing process, we concluded that its use was indirect rather than direct, citing Phillips & Buttorff Mfg. Co. v. Carson, 188 Tenn. 132 (217 SW2d 1) where in interpreting a similar provision of the Tennessee Act it was held that the use of coal or of oil as energy-supplying materials in the manufacturing process were not exempt because their use in the process was indirect rather than direct.

Another case which clearly illustrates the difference in a direct and indirect use is Ohio Stove Co..v. Bowers, 171 Ohio St. 484 (172 NE2d 295) which dealt with machinery for making sand molds and cores for the pouring of castings. There the court pointed out that "the test is not whether the property is essential to the operation of the plant, but whether it is an actual part of the process of manufacture. There is no question that the molds themselves are a part of the process of manufacturing the castings . . . However essential the machinery which makes such sand molds and cores is to the carrying on of applicant's business, such machinery cannot be considered as being used directly in the production of grey iron castings."

The taxpayer here is engaged in the canning of soft drinks

for sale to wholesalers of Coca-Cola, Pepsi-Cola, Dr. Pepper, and the like. It has a production line system of canning. The Coca-Cola Company sends its syrup in metal containers to the plant. Others send their flavors to be mixed with liquid sugar. All are mixed, in the canning process, with carbonated water and then sealed in cans of suitable size for eventual sale at retail to the consumer. We turn now to the items in question and the use of each in the production process.

*The sugar tank.* The taxpayer's president testified that the sugar tank is a round stainless steel tank about eleven feet in diameter and the same height, with a sterile lamp inside the pump for keeping the air in the tank pure at all times and that *"the purpose of the tank is to receive and store liquid sugar* as we receive it from the sugar refinery." We cannot conclude that a storage use is one directly in the manufacturing process.

*The syrup storage tank.* Concerning this he testified that it was for mixing the Coca-Cola syrup with liquid sugar "to make it into a prepared syrup ready to use." It seems obvious that this is likewise an indirect use.

*The steam generator and boiler.* These are really two steam generators or two steam boilers. They are machinery or equipment of the same kind. The president so testified. These are used to heat water, which is in turn sprayed on the cans for bringing them to a determined temperature. The steam itself never touches the cans. It is in coils which are in the water. We conclude this to be an indirect use.

*The air compressor.* While it appears that this item is located in another room away from the production line, we do not deem its location to be of importance, for it is directly connected by air lines to the production line and is located at a distance away and in another room because of the noise that it makes when running. The taxpayer's president testified that "all cans or bottles must have a counterpressure in the filler head supplied by compressed air; otherwise you cannot introduce the liquid from the filler bowls into the cans or bottles and this is a commonly required piece of equipment in every soft drink operation. It is absolutely necessary to get the product into the container. Its primary purpose is to create a

counterpressure against the pressure generated by the carbonic gas so that it will equalize. It also serves the purpose of operating certain parts of various machines such as the packers and even the water system has a small amount of air required to keep the pressure equal in it, but its primary purpose is for filling the cans." This we regard as a direct use in the manufacturing process. That there may be some incidental use of the compressed air in operating parts of the machinery, cleaning syrup lines, etc., is not enough to keep the general or overall use from being one direct in nature.

*The Rapistan full case conveyor.* After the drinks have been canned on the production line they are moved and stacked preparatory to shipment. This, we think, is a use after the manufacture has been completed and is not a direct one in that process.

Consequently, we conclude that the trial court was correct in its ruling as to the air compressor and as to the full case conveyor, but was in error as to his ruling on the others.

*Judgment reversed in part and affirmed in part on the main appeal; affirmed on the cross appeal. Jordan, P. J., and Pannell, J., concur.*