**WILSON & CO., INC.,**
**Plaintiff-Respondent,**

v.

**DEPARTMENT OF REVENUE,**
**Defendant-Appellant.**

**No. 58940.**

Supreme Court of Missouri,
Division No. 2.

Jan. 12, 1976.

Robert H. House, Asst. Atty. Gen., Jefferson City, for defendant-appellant.

George S. Huff, Huff & Huff, Marshall, for plaintiff-respondent.

HENLEY, Judge.

The question presented in this case is whether the conversion of live hogs into marketable portions of fresh meat and other products is "manufacturing" within the meaning of § 144.030, subsection 3(4),[1] providing for exemption from the sales and use tax of certain machinery and equipment purchased and used to establish new or expand existing manufacturing plants in this state. We hold that it is manufacturing.

In late 1973 Wilson & Co. (hereinafter Wilson or plaintiff) erected at Marshall, Missouri, a new hog slaughtering and packing plant in which it installed machinery and equipment purchased for use in that process. This machinery and equipment had a total value of $3,092,431.74. Of that amount sales/use tax was paid by Wilson to the state on $21,942.92, leaving a balance of $3,070,488.82 on which no tax was paid. Following an informal hearing, the Director of Revenue on May 17, 1974, assessed a sales/use tax of $92,114.66 plus interest. Thereafter, Wilson sought a reassessment and, as a result of a rehearing in connection therewith, this plaintiff and the Department of Revenue (defendant) entered into a stipulation in which they agreed: (1) that of certain machinery and equipment (separated and described in the stipulation) purchased and used in the facility some was

1. Reference to sections of statutes are to RSMo 1969 and V.A.M.S.

taxable and some was exempt from the tax; and (2) that they were unable to agree upon and there remained between them a dispute as to whether certain other machinery and equipment (described in the stipulation) purchased for and used in the facility and having a value of $2,517,497.84 was exempt from the tax under § 144.030.3(4).

Shortly thereafter, plaintiff commenced this action under § 144.685 seeking review of defendant's order assessing the tax upon the above-mentioned machinery and equipment having the agreed value of $2,517,-497.84 and a judgment "reversing the order of assessment." Judgment was for plaintiff and defendant appealed. Construction of a state revenue law is involved; hence, this court has appellate jurisdiction. Mo. Const. Art. V, § 3.

The machinery and equipment, the taxability of which is in dispute, is installed in plaintiff's new plant and arranged to function and be utilized as parts of a "mass-production line" or facility running through several departments and rooms of the plant. It is no doubt designed to handle several thousand hogs per day and employ several hundred persons, as plaintiff suggests in its verified petition.

The facts are not in dispute. The process by which the animal is transformed into edible meat ready for human consumption and into other products begins in the "kill and cut" department. As the hog on hoof enters this department he is stunned with an electrical device, immediately stuck with a knife and killed, and hung from an overhead conveyer which carries the body to a scalding tub where the hair is soaked and loosened. From there the carcass is carried through a dehairing machine, to and through a singeing apparatus, and then to a polisher were any remaining hair or dirt is washed and polished off. Leaving there, the conveyer system carries the carcass through the dressing chain where it is shaved, the head and entrails removed by hand, the body cut in half by a manually operated power saw, rewashed, and deposited in the cooler for 12–14 hours which low-

ers the meat temperature to approximately 37 degrees. From the cooler the two halves of the carcass go to the "cut" room of the department where they are cut up by various hand-knife, saw and mechanical means into hams, shoulders, loins and ribs, leaving only the belly and fat back. The belly is then separated from the fat back by a power-operated stationary knife. In the meantime, the entrails which were removed in this department have moved on direct to the "meat specialty" department. The several cuts of meat then move to the "converting" room.

In the converting room, the cuts of meat above described are reduced in weight by hand trimming, and further cut, trimmed, or deboned to meet the specifications of a particular order of a customer. Most of these cuts of meat are sold to wholesalers, processors or manufacturers. None of the meat is smoke-cured at this plant. After the trimming and deboning, these cuts move to the "denatured pack" department.

The entrails which came from the "cut" room are joined by the ears, snouts and brains in the "meat specialty" department where they are again cleaned, trimmed, washed and chilled, and packed ready for shipping.

In the "denatured pack" department, into which the trimmed or deboned cuts of meat have moved, two functions are performed. One, the meat is inspected by government inspectors and separated into that which is "fit" for human consumption and that which is "unfit." Two, the "fit" and "unfit" are then again cleaned and chilled, and separately wrapped and packaged ready for shipment. The packages of meat which the inspection has determined to be unfit for human consumption are sold to animal feed producers.

The waste materials from the hog, such as the blood, hair, inedible greases, etc., have, during this process, gone direct to the "inedible rendering" department where it is rendered, dried, cooked and stored in silos

ready for shipment to soap makers or animal feed producers.

The energy, other than human, necessary for the operation of this "production line" comes from the "power" department which employs miscellaneous electric motors and switch controls, water pumps, boilers, air compressors, and ammonia compressors and other refrigeration equipment.

Defendant contends that the purchase of the machinery and equipment used in the above-described operation is not exempt from the sales/use tax, because it is not "used directly in manufacturing * * * a product * * * intended to be sold ultimately for final use or consumption." Defendant argues, as we understand the argument, "that manufacturing does not include mere processing" of a hog by slaughtering and butchering; that for this processing to be manufacturing it must also include, for example, the making of sausage and the smoking or otherwise curing or seasoning of bacon and ham.

Subsection 3(4) of § 144.030 provides that the following machinery and equipment shall be exempt from the sales/use tax:

"Machinery and equipment purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption."

Three recent decisions of this court have considered what is manufacturing within the meaning of this section. *West Lake Quarry and Material Company v. Schaffner, Director, Department of Revenue*, 451 S.W.2d 140 (Mo.1970), involved, inter alia, the processing of rock after its delivery from the quarry to plaintiff's plant. The processing included grinding and crushing the rock and sorting it into various sizes for many different commercial uses. The court held that this process, which took something practically unsuitable for any common use and changed it so as to adapt it to a common use, is manufacturing, and the machinery and equipment purchased for and used in that process is entitled to the exemption afforded by § 144.030, subd. 3(4). 451 S.W.2d at 143[1–2].

*Heidelberg Central, Inc. v. Director of Department of Revenue*, 476 S.W.2d 502 (Mo.1972), involved "job-printing," the products of which included business forms, stationery, printing advertising, postcards and church bulletins. The court held that this process involved the production from raw materials of new and different salable articles suitable for new and different uses, and was manufacturing; that the machinery and equipment purchased for and used in that process is therefore entitled to the exemption afforded by § 144.030, subd. 3(4). 476 S.W.2d at 506[1, 2].

*State ex rel. AMF Incorporated v. Spradling, Director of Revenue*, 518 S.W.2d 58 (Mo.1974), involved the process of retreading a worn tire carcass and making it usable. The court held that this was not manufacturing within the meaning of the sales tax exemption statute, but was "simply the repair of a tire by furnishing it with a new tread by cementing, molding, and vulcanizing * * * tread upon the bare cord fabric of a worn tire * * *." The court distinguished this case from the *West Lake* and *Heidelberg* cases, saying that this process took a tire, originally manufactured so as to be suitable to a common use, and repaired and restored it to its originally intended common use, whereas the process in those cases "took something * * * practically unsuitable for common use, and changed it to [a] new and commonly usable * * *" item.

We have considered the cases from other jurisdictions cited by the parties. Most are distinguishable from this case in one way or another. Those that are comparable are not persuasive.

The *West Lake* and *Heidelberg* cases are controlling. The conversion of a live hog into marketable portions of food suitable for human consumption and into other mar-

ketable products is manufacturing within the meaning of § 144.030, subd. 3(4). It is: a "process which took something practically unsuitable for any common use and changed it so as to adapt it to * * * common uses"; "the production from raw material of new and different salable articles for new and different uses." The machinery and equipment used in this process, described in the parties' stipulation as being that about which there remained a dispute between them, is exempt from a sales/use tax thereon.

The judgment is affirmed.

All concur.