## 52313. SOUTHWIRE COMPANY v. CHILIVIS.

PANNELL, Presiding Judge.

The State Revenue Commissioner assessed sales and use taxes against the Southwire Company for the period from January 1, 1970 to April 30, 1973. Southwire appealed the assessment to the Superior Court of Carroll County. Both Southwire and the Revenue Commissioner filed motions for summary judgment. The trial judge granted summary judgment in favor of the Revenue Commissioner. Southwire appeals the denial of its motion for summary judgment and the granting of summary judgment in favor of the Revenue Commissioner.

This appeal presents two distinct issues of law. The first issue is whether certain equipment and machinery purchased by Southwire qualify for exemption under the Sales and Use Tax Act. The second issue is whether a tolling arrangement employed by Southwire results in the sale of conversion services only or in the sale of a new copper product to Southwire's customers.

EXEMPTION FROM THE SALES AND USE TAX

The Sales and Use Tax Act imposed a tax upon the "sale at retail" and use of tangible personal property. Ga. L. 1951, pp. 360, 362 as amended (Code Ann. § 92-3402a (a) and (b)). Appellant Southwire contends that certain of its purchases of equipment are exempt from sales and use taxes because they are "machinery which is used directly in the manufacture of tangible personal property." Ga. L. 1963, p. 13 (Code Ann. § 92-3403a C (2) (n)). The machinery involved is electrical equipment used in the process of refining scrap copper. The equipment includes rectifiers, busbars, a monitoring system

(infrared scanner), electrical switches, and electrical metering and monitoring equipment. A simplified description of the various items of equipment and their functions follows.

The rectifiers transform outside electrical current from alternating current into direct current. This direct current is then transmitted to electrolytic cells through busbars (electrical conducting blocks). Located within the electrolytic cells are an impure copper anode and a pure copper cathode. The rectifiers send out electricity through the busbars to the pure copper cathode and draw in electrons through other busbars from the impure copper anode. This function creates a deficiency of electrons in the copper atom (thereby creating a copper ion) and an abundance of electrons at the cathode. The copper ions are thus attracted to the copper cathode where they plate out into the form of pure copper.

The electrical switches direct the electrical current to the electrolytic cells and control the amperage in the rectifiers. The electrical monitoring devices, infrared line scanner and other monitoring equipment, are used to monitor the functioning of the electrical current, to detect electrical short circuits in the refining system, and to monitor the environment of the copper.

Appellant Southwire claims exemption of all of the above equipment under the provisions of Code Ann. § 92-3403a C (2) (n) 1 (Ga. L. 1963, p. 13). The statute provides an exclusion from the sales and use tax for "[t]he sale of machinery which is *used directly* in the manufacture of tangible personal property when such machinery is incorporated for the first time into a new manufacturing plant located in this State." (Emphasis supplied.) The Revenue Commissioner asserts that the equipment does not satisfy the "used directly" aspect of the exemption as interpreted by the decisions of this court. Three cases have interpreted the phrase "used directly." See *Blackmon v. Screven County Industrial Development Authority,* 131 Ga. App. 265 (205 SE2d 497); *Hawes v. Custom Canners, Inc.,* 121 Ga. App. 203 (173 SE2d 400); *State of Ga. v. Cherokee Brick &c. Co.,* 89 Ga. App. 235 (79 SE2d 322). All three cases have narrowly restricted the application of the exemption in accordance

with the general proposition that in interpreting tax exemptions all doubts must be resolved in favor of the taxing authority. *Cherokee Brick &c. Co. v. Redwine,* 209 Ga. 691 (75 SE2d 550); *Oxford v. J. D. Jewell, Inc.,* 215 Ga. 616, 619 (112 SE2d 601).

In *State of Ga. v. Cherokee Brick &c. Co.,* supra, the court dealt with a similar provision exempting industrial materials "used directly in the fabricating, converting or processing of articles of tangible personal property or parts thereof for resale." Ga. L. 1951, pp. 360, 365. The court held that "[f]laming natural or artificial gas used to produce heat, which produces physical and chemical changes in the raw materials used to produce brick and clay products, is not *directly* used in the fabricating, converting, or processing of those products within the meaning of section 3(c)2 of the Act of 1951. . . so as to exempt from taxation the sale, use, or consumption of such gas or gases." The court reasoned that the gas itself did not perform a function in the process of manufacturing brick; rather, it was the heat generated by the flaming gas which converted the clay into the brick. Thus, the court held that the gas was indirectly, rather than directly, used in the manufacturing process.

We find the above facts to be analogous to the factual situation in the present case. The rectifiers and busbars do not themselves perform a function on the scrap copper; rather, it is the electricity transformed and transferred by these devices which produces chemical and physical changes in the raw materials used to produce pure copper plates.

Appellant Southwire contends that the equipment for which it claims exemption is similar to the air compressors which were held exempt in *Hawes v. Custom Canners, Inc.,* 121 Ga. App. 203 (173 SE2d 400). The air compressor created a counter-pressure in the fillerhead of cans and bottles. This allowed the introduction of the liquid into the cans and bottles. Thus, the air compressor directly affected the production of the finished product. There was no intervening agency. However, in our case, the rectifier and busbars do not directly effect the chemical change in the raw material; rather, the electrical current creates an electron imbalance within

the electrolytic cell, which causes a chemical and physical change in the raw material. The rectifier and busbar simply modify and transmit this electrical current. This process is more closely analogous to the function of the steam generator and boiler in the *Custom Canners* case. These items were used to heat water which was sprayed on cans to bring them to a determined temperature. This court held that the steam generator and boiler were not used directly in the manufacturing process.

In *Blackmon v. Screven County Industrial Development Authority,* 131 Ga. App. 265, supra, this court held that climate control equipment, used in the manufacture of synthetic yarn, was not "used directly" in manufacture within the meaning of the statute. The court concluded that the equipment, though essential to the manufacturing operation, was designed to control the environment of the goods. The court held (p. 267) that "devices used to affect the environment of goods in manufacture are not 'used directly' in manufacturing. As this court stated in *Custom Canners,* ' "the test is not whether the property is essential to the operation of the plant, but whether it is an actual part of the process of manufacture." ' 121 Ga. App. 203, 205." The court further stated that one test for "direct use" in manufacture is the absence of an intervening agency. The climate control equipment failed this test because it *operated solely on the air* which then, as an intervening agency, circulated around the yarn. Similarly, in the present situation, the busbars and rectifiers *operate solely on the electrical current* which then, as an intervening agency creates an environment within the electrolytic cell necessary to produce the refined copper.

We conclude that the rectifiers and busbars are not equipment "used directly" in the manufacture of tangible personal property. The remaining items of equipment are even further removed from the actual process of manufacture and are likewise indirectly used in the manufacturing process. Our decision is further supported by the general proposition "that in interpreting tax exemptions all doubts must be resolved in favor of the taxing authority. [Cits.]" *Blackmon v. Screven County,* supra, p. 267.

CHARACTER OF SOUTHWIRE'S "TOLLING TRANSACTIONS"

Appellant Southwire engages in what it terms "tolling transactions" with some of its customers. Under this arrangement the customer supplies scrap copper to Southwire. The customer is then given a "raw material allowance" for the value of the scrap copper, according to its grade and weight. These customers are later supplied with a new copper product from Southwire. The customer is billed the gross sales price of the new product less his "raw material allowance."

Appellant argues that these particular customers are purchasing only the cost of converting their own scrap copper into a new copper product and that only the cost of conversion should be taxed. See *Superior Type, Inc. v. Williams,* 98 Ga. App. 89 (105 SE2d 14). The Revenue Commissioner contends that the customers actually sell their scrap copper to appellant and later purchase new copper products from Southwire; and therefore, the tax assessment should be on the gross sales price of the new product. Thus, the issue is whether the "tolling arrangement" results in the sale of conversion services only or in the sale of a new copper product to Southwire's customers. The determination of this issue depends ultimately on whether the customer's scrap copper is actually sold to Southwire or only provided to Southwire for a conversion service.

The record shows that the customer initially notifies Southwire that he has scrap copper which he wishes to send to Southwire. Upon receipt of the copper, Southwire notifies the customer of the amount received and credits the customer's account with a "raw material allowance." This allowance is based on the value of the scrap copper as of the time it is turned in to Southwire. The copper is then commingled with other scrap copper of the same grade. It may be made into a variety of new products, or it may even be sold as scrap to a third party. Southwire has the sole right of possession and control of the scrap copper.

The customer supplying scrap may later order a new product from Southwire. Or he may elect to be paid the value of the scrap or have an equivalent amount of scrap returned to him. The customer who elects to order a new copper product is not told that his particular scrap will be

converted into a new product. Rather, he is advised of his copper content credit (raw material allowance) and of the net cost of a new product taking into account this credit. The customers who supply scrap are ultimately billed the same gross sales price for any new product as all other customers. They then receive a credit for the value of any scrap previously turned in to Southwire.

It appears clear to this court that Southwire is actually purchasing scrap copper from its "tolling" customers. However, rather than pay money for the scrap, Southwire gives the customer a credit for the value of the scrap. This credit is later applied toward the purchase price of a new copper product. Actually, two separate sales are involved in this transaction: the sale of the scrap copper to Southwire and the sale of the new product to the customer. See Ga. L. 1951, pp. 360, 363 (Code Ann. § 92-3403a B). The sale of the scrap copper to Southwire is not taxable because of the industrial material exemption. See Ga. L. 1951, pp. 360, 365 (Code Ann. § 92-3403a C (2)). However, the sale of the new product to the customer is taxable as a sale of tangible personal property at retail. All sales of tangible personal property at retail in Georgia are subject to a tax on the sales price thereof. See Ga. L. 1951, pp. 360, 362 as amended (Code Ann. § 92-3402a(a)). The taxable "sales price" is "[t]he total amount for which tangible personal property or services are sold, including any services that are a part of the sale, valued in money, whether paid in money or otherwise, and *includes any amount for which credit is given to the purchaser by the seller, without any deduction therefrom on account of the cost of the property sold, the cost of the materials used, labor or service costs, losses or any other expenses whatsoever. . ."* Ga. L. 1951, pp. 360, 367 (Code Ann. § 92-3403a E). (Emphasis supplied.) We find that the gross sales price of the new product is subject to a sales tax. The Revenue Commissioner correctly assessed a sales tax against the gross sales price of the new product.

Southwire argues that even if the tolling arrangements are construed as sales of a new copper product rather than a conversion of the customer's property, the scrap copper should be considered a "trade-in" on the new copper product. Code Ann. §

92-3420a provides: "Where used articles are taken in trade, or a series of trades as a credit or part payment on the sale of new and used articles, the tax levied by this Chapter shall be paid on the net difference of the new or used articles less the credits for the used articles." Ga. L. 1951, pp. 360, 374. As previously discussed, the scrap copper was "sold" to Southwire; and in a separate transaction, new copper products were sold to the customer. There was no "trade-in" of one product for another. Rather, the facts show two separate sales transactions. Accordingly, the "trade-in" argument is without merit.

*Judgment affirmed. Marshall and McMurray, JJ., concur.*

ARGUED JUNE 8, 1976 — DECIDED JUNE 30, 1976 — REHEARING DENIED JULY 16, 1976 — 

*Christopher N. Zodrow,* for appellant.

*Arthur K. Bolton, Attorney General, David A. Runnion, Assistant Attorney General,* for appellee.