FLOYD CHARCOAL COMPANY,
INC., Respondent,

v.

DIRECTOR OF REVENUE, State of
Missouri, Appellant.

No. 61383.

Supreme Court of Missouri,
Division No. 1.

May 13, 1980.

Rehearing Denied June 10, 1980.

John Ashcroft, Atty. Gen., Marjorie Haines, Asst. Atty. Gen., Jefferson City, for appellant.

David L. Steelman, Salem, for respondent.

WELBORN, Commissioner.

Department of Revenue assessed Floyd Charcoal Company, Inc., $20,294.87 tax and interest for failure to file correct sales/use tax returns and pay correct amount of tax from January 1, 1971 to November 30, 1973. Taxpayer petitioned for reassessment. After hearing, the assessment was affirmed. Taxpayer appealed to circuit court which reversed the order affirming the assessment. Director of Revenue appealed to this Court because construction of revenue laws is involved. Mo.Const. art. V, § 3.

Floyd is in the business of producing charcoal briquettes of the type commonly used for outdoor barbecuing. Prior to the purchase of the various items of plant equipment involved in this controversy, Floyd produced the product by a so-called "batch system," involving the mixing of ingredients in specified quantities, sufficient to produce a given quantity of briquettes within a given period of time. The equipment here involved permitted operation in a "continuous flow system," in which the ingredients are mixed on a continuing basis and constantly run through the process required to produce the briquettes.

The new equipment increased Floyd's production capabilities and resulted in an improved product in that the new briquettes produce more heat than those manufactured by the "batch" process.

The first question presented is whether or not the items of equipment involved were

exempt from sales tax as machinery and equipment directly used in the manufacturing of charcoal briquettes. Also presented is the question of the effect of the condition of exemption that the purchase of the equipment be the result of a product or design change. An issue is also presented regarding the taxability of purchase of pallets used in shipping and of oil used in the manufacturing process.

The items of equipment involved are as follows (The basis of the description is the findings of the hearing officer. No transcript of the hearing was made and the parties agree that his findings may be considered as the evidence presented upon the administrative hearing.):

(A) The Starch System: this particular group of equipment consists of conveyors of storage bins for the purpose of removing starch from railroad cars, storing it temporarily in storage bins and then conveying it from the storage bins to the processing area at the time the material is needed. No change upon the raw material takes place at any time while the starch is conveyed or held in the equipment described;

(B) Twin-Screw Feeders: the feeders are used to mix raw materials and feed them onto a conveyor which moves the raw materials into the press and subsequently into the ovens. The twin-screw feeders mix automatically what previously was mixed under the "batch system;"

(C) The Paddle Mixers: this equipment actually mixes the raw materials with certain starch additives in the "continuous flow system;"

(D) The Briquette Machine or Press: this machine processes the raw materials and presses them into the final shape. The compression of the raw materials is not only to form the briquette but also to remove as much moisture as possible prior to processing the briquette in the oven to remove additional moisture;

(E) Exact Weight Scales: this instrument is used to weigh the charcoal prior to the time that it is put into the sacks. The taxpayer indicated that each 20-pound sack must contain the minimum 20 pounds of charcoal or it may be rejected by some states on the basis that the manufacturer is misrepresenting the amount of goods supplied;

(F) The Sackamatic System and Filter: this equipment is used to sack the finished charcoal product more quickly than the method previously used by the taxpayer. Prior to the purchase of this particular piece of equipment, the sacks were held by hand and, after being filled, they were transferred by hand to another area to complete the sacking process;

(G) The Sewing Heads: the heads are used to sew the sack closed at the top after the briquettes have been put into the sack. The sack is used as the container for the product and is sold with the product to the final consumer;

(H) The Check Weight and Panel: this equipment is used to weigh the sack after the charcoal has been put into it. The purpose is to recheck the final product as sacked to insure that the sack plus the charcoal weighs at least 20 pounds;

(I) The Film Bags: these are plastic bags used by the taxpayer to enclose the original paper sacks which contain the charcoal. The purpose of the plastic bag is to protect the charcoal from moisture during transportation. The bag is usually attached to the final product only upon the request of a customer; an additional charge is made by the taxpayer to the customer for this service. The sacks are removed by the taxpayer's customer upon receipt and are not eventually resold to the consumer in any form;

(J) The Stairways: these are stairways and ramps that are used by the taxpayer's employees to reach the top portion of the paddle mixer and other equipment.

As to items A (the starch system), E (the exact weight scales), F (the sackamatic system), G (the sewing heads), H (the check weight and panel), I (the film bags), and J (the stairways and ramps), the hearing officer concluded that they were not exempt under Section 144.030.3(3) and (4) because

they are not used directly in the manufacturing of charcoal briquettes. As to items A (the starch system), B (the twin screw-feeders), C (the paddle mixers), and D (the briquette machine), the hearing officer found that they were not exempt under Section 144.030.3(3) because they were not replacing machines for the same purpose by reason of design or product changes and that they were not exempt under Section 144.030.3(4) because they were not purchased to expand an existing plant or to establish a new plant.

The circuit court made a general finding reversing the assessment without elaboration. The court did enter judgment against the taxpayer for $152.19 tax admitted by taxpayer to be owing.

Involved on this appeal are exemptions from sales provided by subsections .3(3) and (4) of Section 144.030, RSMo 1969, as follows:

"(3) Machinery and equipment, replacing and used for the same purposes as the machinery and equipment replaced by reason of design or product changes, which is purchased for and used directly for manufacturing or fabricating a product which is intended to be sold ultimately for final use or consumption;

"(4) Machinery and equipment, purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery and equipment is used directly in manufacturing, mining, or fabricating a product which is intended to be sold ultimately for final use or consumption;"

(A 1977 amendment of these provisions inserted after the words "Machinery and equipment," the language "and the materials and supplies solely required for the installation or construction of such machinery and equipment" in each of the subsections. Laws of Mo.1977, p. 328.)

Section 144.615(3) makes these exemptions applicable also to the use tax.

Appellant asserts that, as to the items which the hearing officer concluded were not "used directly in manufacturing a prod-uct * * *," the trial court's overturning of such findings was based upon an erroneous construction of the exemption statute and that the hearing officer correctly found such items subject to tax.

This contention brings to this Court for the first time the meaning of the language "used directly in manufacturing a product." Previous cases have considered what "manufacturing" includes. See *Wilson & Co., Inc. v. Department of Revenue*, 531 S.W.2d 752 (Mo. banc 1976) (pork processing), and *West Lake Quarry & Material Co. v. Schaffner*, 451 S.W.2d 140 (Mo.1970) (rock quarrying).

The exemption found in the Missouri statute is not unique. Sales and use tax laws of other states contain similar provisions which have produced considerable litigation and two rather clearly defined lines of authority. The appellant espouses the somewhat stricter view which has been followed by some appellate courts, particularly of Ohio and Georgia. That view limits the exemption to machinery and equipment which perform a function involving a change of the raw material involved into the finished product and excludes machinery and equipment used in preparation for manufacturing or after completion of the manufacturing process. See *Ohio Stove Co. v. Bowers*, 171 Ohio St. 484, 172 N.E.2d 295 (1961); *Canton Malleable Iron Co. v. Porterfield*, 30 Ohio St.2d 163, 283 N.E.2d 434 (1972); *Southwire Co. v. Chilivis*, 139 Ga. App. 329, 228 S.E.2d 295 (1976); *Hawes v. Custom Canners, Inc.*, 121 Ga.App. 203, 173 S.E.2d 400 (1970).

The rationale of these cases appears to be the oft-repeated rule that exemptions from taxation are to be strictly construed against the taxpayer and any doubt is resolved in favor of application of the tax.

Relying upon such construction, appellant asserts that the starch system moves and stores raw materials prior to the processing but that no change occurs in the raw materials while they are in the starch system and therefore it is not used directly in the manufacturing of the briquettes. He further asserts that the exact weight scales,

the sackamatic, the sewing heads, the check weight and panel and the film bags are used after completion of the manufacturing process and therefore cannot be said to be used "directly" in manufacturing. Basically, appellant argues that because the manufacturing of the briquettes could be accomplished without the use of any of these items of equipment, the exemption does not extend to them.

Respondent supports what is known as the "integrated plant" theory of construction of an exemption such as this. This nomenclature appears to have originated with *Niagara Mohawk Power Corp. v. Wanamaker*, 286 App.Div. 446, 144 N.Y.S.2d 458 (1955), a case in which the court considered a sales tax exemption for items for use "directly and exclusively" in the production of tangible personal property. At issue was the taxability of coal and ash conveying equipment used in the generation of electric power. In considering the issue the court stated:

" * * * The basic questions are the following: (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?

\* \* \* \* \* \*

" * * * It is not practical to divide a generating plant into 'distinct' stages. It was not built that way, and it does not operate that way. The words 'directly and exclusively' should not be construed to require the division into theoretically distinct stages of what is in fact continuous and indivisible." 144 N.Y.S.2d at 461–462.

The court in that case gave weight to the policy which it considered to have been embodied in the exemption of avoiding double taxation.

More recently some courts which have adopted the "integrated plant" rule have noted that the exemption such as that found in the Missouri statute was in furtherance of " * * * the objective of the legislature in creating particular exemptions to encourage the location and expansion of industries in [the state]." *Schenley Distillers, Inc. v. Commonwealth of Kentucky*, 467 S.W.2d 598, 601 (Ky.1971). In that case, a conveyor system used in a distillery to move cases of empty bottles from the loading point to bottling lines was held to be "machinery used directly in the manufacturing process" within the meaning of the sales and use tax statute there involved. See also *Ross v. Greene & Webb Lumber Co., Inc.*, 567 S.W.2d 302, 304 (Ky.1978); *Cheney v. Georgia-Pacific Paper Corporation*, 237 Ark. 161, 371 S.W.2d 843, 847[4] (1963); *Arkansas Beverage Company v. Heath*, 257 Ark. 991, 521 S.W.2d 835, 842–843 (1975). In *West Lake Quarry & Materials Co.*, 451 S.W.2d 142[1], the court stated: "Obviously, the purpose of exempting machinery and equipment used in manufacturing or mining products to be sold for final use or consumption is to encourage the development of such enterprises to produce products in this state which are subject to sales tax when sold and thus build up the economy of this state."

The Ohio rule has been considered too restrictive by other courts which have been presented with a similar problem. See *Courier Citizen Co. v. Commr. of Corporations and Taxation*, 358 Mass. 563, 266 N.E.2d 284 (1971); *Duval Sierrita Corp. v. Arizona Dept. of Revenue*, 116 Ariz. 200, 568 P.2d 1098 (1977). In the latter case, the court concluded that the items of machinery and equipment which were essential to the operation (copper mining) as an integrated process should be included under the "directly used" exemption.

Although concededly the issue was not directly presented in *Wilson & Co.*, where the court was concerned with whether or not slaughtering and processing of hogs was manufacturing, the court obviously considered the integrated nature of the operation, the court noting that the machinery there in question was used as part of a "mass-production line," 531 S.W.2d 753. Likewise, in *West Lake Quarry*, the court

found that machinery employed in the removal of overburden preparatory to the quarrying of rock was within the exemption provided for equipment directly used in mining, there in question. Again, admittedly, the question presented was whether or not quarrying was mining. However, it is obvious that the court approached the operation from an integrated point of view.

■ Those cases certainly are consistent with the integrated plant approach. Such an approach is consistent with the above mentioned legislative intent behind the exemption. Modern manufacturing facilities are designed to operate on an integrated basis, evidenced by the installation involved in this case. To limit the exemption to those items of machinery or equipment which produce a change in the composition of the raw materials involved in the manufacturing process would ignore the essential contribution of the devices required for such operation.

■ Appellant argues that the test to be employed is whether or not the manufacturing operation may be carried on without the machinery in question. He says that charcoal briquettes could be manufactured without the starch system and therefore it is not directly used in the manufacturing of briquettes. Such a test does not comport with the reality of the process involved. The starch machine contributes to the continuous flow process employed by respondent and that process requires the starch system. Insofar as the exemptions here involved are concerned, the starch machine should be considered to be directly used in the manufacturing process. Whether it meets further requirements for exemption will be considered below.

■ As for the equipment involved in the weighing and sacking, appellant argues that the manufacturing process has been completed when the operation of that equipment is involved and therefore it is not directly used in manufacturing. Respondent produces charcoal briquettes but it produces them for distribution and sale only in packages which must be accurately weighed and closed. Those steps are an integral part of the respondent's manufacturing process.

■ The record is somewhat vague as to the stairways and ramps. The hearing officer found that they are primarily used as repair assistance equipment to reach the top portion of the paddle mixer and other equipment. There is no evidence as to what extent, if any, these items are a part of the integrated system installed by respondent. Conceivably they might be nothing more than ladders placed near the equipment. Absent some further showing that they are an integral part of the processing system and of the use, the finding of the hearing officer must be upheld.

With respect to the twin-screw feeders, the paddle mixers and the briquette machine, appellant does not question that they are directly used in respondent's manufacturing process. As to those items, appellant argues that respondent has not demonstrated that such equipment replaced the equipment previously used "by reason of design or product changes" so as to bring the exemption under subparagraph (3) into play or that it was used to "expand existing manufacturing" facilities, within the meaning of the exemption accorded by subparagraph (4). Appellant also contends that if the starch system is found to be used directly in manufacturing, it still would not be exempt in view of the further requirements of subparagraphs (3) and (4), here under consideration.

■ Dealing first with subparagraph (4), the hearing officer stated respondent "indicated that in respect to some of the equipment in question, the purchases were made to increase the production capabilities of (respondent) to produce a better product faster, * * *." Such a vague "indication" is not sufficient to meet the taxpayer's burden of showing that the equipment was purchased to expand the existing plant within the meaning of subparagraph (4).

With respect to subparagraph (3), the parties differ as to the meaning of the language "design or product changes." Ap-

pellant contends that the design change there referred to is a change in the design of the product. Respondent contends that the design change properly is a change in the design of the machinery involved. Appellant apparently considers the language involved to be unambiguous. He offers no rationale for his bald assertion of its meaning. Respondent, on the other hand, contends that a change in the design of a product is a change in the product so that the word "design" would become superfluous under appellant's construction. Respondent asserts that the word "design" must be given meaning and that in the context here, meaning can be accorded it only if it refers to a change in the design of the machinery involved.

Again, although this exact issue was not considered, the construction advocated by respondent appears to have been accepted by the court in *Heidelberg Central, Inc. v. Director, Dept. of Revenue*, 476 S.W.2d 502, 503 (Mo.1972), the court noting that the machinery there in question and found exempt (printing presses) had been purchased " * * * either to expand existing plants *or to replace existing machines because of changes in design.*" (emphasis supplied)

Respondent's construction does give effect to all of the language and absent support for appellant's construction beyond its assertion, the respondent's position accepted as providing the correct meaning of this phrase.

■ However, on this record it cannot be said that respondent demonstrated that it met the condition of exemption that the new machinery replaced existing machinery because of "design change." Insofar as the record here shows, the machinery was purchased to make a "continuous flow system" possible and replaced obsolete and worn out machinery. However, there is nothing to show what if any of the items here under consideration, i. e., the starch system, the paddle mixers, the twin-screw feeders and the briquette machine replaced previously used machinery because of a *design* change. Inasmuch as the hearing officer apparently construed the exemption in the manner here advocated by appellant, he made no express finding on the issue of replacement by reason of change in design of the machinery. On this record, no determination of the issue by this court is possible and that portion of the assessment must be remanded to the Director for determination of that issue in the light of the construction of the statute herein stated.

The vague statement that the briquettes produced by the new system provided "more heat" when consumed by the user was not sufficient to compel the conclusion that the machinery was purchased *by reason* of a product change. Insofar as the record shows, that was a result, rather than a reason.

■ The trial court's reversal of the assessment included the film bags. Nothing in this record shows that these items are directly used in manufacturing and no basis appears for overturning the assessment on that item.

### Pallets

Bags of charcoal produced by Floyd are shipped to its customers on wooden pallets. Floyd purchases the pallets from various pallet makers and gives them sales tax exemption certificates on the basis that Floyd's purchase is for resale. Pallets cost Floyd approximately four dollars each.

Upon sales by Floyd, it invoices customers approximately five dollars for each pallet involved in a shipment. "The pallet is then shipped with the finished product to Taxpayer's customer and when the merchandise is removed from the pallet the customer may ship the pallet back to Taxpayer and receive full credit for any and all charges made by Taxpayer to the customer on a per pallet basis. Taxpayer will credit the customer's next purchase order for each pallet returned in the amount indicated above. The purchase price of the pallet to Taxpayer by the pallet makers is usually an amount less than the charges made by Taxpayer to the customers on a per pallet basis. * * * Taxpayer indicated that on many occasions the pallets are not returned to

Taxpayer and that in those instances there is an outright sale of the pallet by the Taxpayer to Taxpayer's customer."

The hearing officer concluded that the sales tax was properly levied on the purchases by Floyd of pallets for the reason that in the cases where the pallets were returned to Floyd, there was no sale and therefore Floyd did not purchase for resale; that in the cases where the purchaser retained and paid for the pallets, Floyd neither collected sales tax on the part of the sales price represented by the pallets nor obtained a certificate from the purchaser that it acquired the pallet for resale, and therefore Floyd was obliged to collect the tax as on a sale at retail; that Floyd had no reason to complain that the tax was assessed against it on the basis of the price it paid for the pallets rather than the price for which it sold them.

In this court the parties treat the issue essentially as whether or not the case of *Smith Beverage Co. of Columbia, Inc. v. Reiss,* 568 S.W.2d 61 (Mo.banc 1978), is applicable under these facts. Respondent asserts that it is and requires the conclusion that its purchases of pallets were for resale and therefore not subject to tax. At issue is the definition of "Sale at retail" as the transfer of title to the purchaser for use or consumption " * * * and not for resale in any form as tangible personal property * * * ." § 144.010(8). Smith involved a use tax exemption of tangible personal property " * * * held * * * solely for resale in the regular course of business." § 144.615(6). (Respondent places no reliance on Section 144.011, enacted in 1973 and in effect during a portion of the time covered by the assessment in dispute. That enactment excluded from "sale at retail" " * * * the transfer of reusable containers used in connection with the sale of tangible personal property contained therein for which a deposit is required and refunded on return.")

*Smith* was a declaratory judgment action on the validity of a regulation of the Department of Revenue relating to the use tax on purchases by bottlers-jobbers of soda

bottles. It was decided on a record which incorporated complete information regarding the transactions in question. See *Smith Beverage Co. of Columbia, Inc. v. Sprad-* 533 S.W.2d 606 (Mo.1976). Here the assessment is against the purchaser on the theory that its purchases were under an improper claim of exemption, as authorized by Section 144.210. The burden was upon Floyd to sustain its claim of exemption by reason of purchase for resale. On this sparse record, it has failed to do so. There is, for example, no showing of how many pallets are returned by purchasers from Floyd. The only thing appearing is the "indication" by the taxpayer "that on many occasions the pallets are not returned * * * ."

Taxpayer relies upon the fact that its charge to its customers for pallets is in excess of the cost of the pallets and points out that in *Smith* the fact that the deposit required by the bottler was *less* than the cost of the item was held to evidence no sale. That is a factor for consideration but absent some evidence of the practical effect of the transaction, it would not be conclusive of a sale.

In any event, if the taxpayer's transfer to its customers is a sale, there is nothing of record to negative the finding that respondent was obliged to collect a tax on the transaction. Respondent's brief asserts that its customers are wholesalers. However, the record which is the basis of review does not contain that fact.

The trial court erred in overturning the assessment for tax on the pallets.

### Fuel Oil

A portion of the tax assessed against respondent was on purchases of fuel oil " * * * used by Taxpayer primarily in its heating ovens to heat, harden and reduce the moisture content of the briquettes in the manufacturing process." The request for hearing sought reassessment of the tax on this item on the grounds that Floyd had an agreement with its supplier that the supplier would pay the tax on the

item. The hearing officer found no such agreement and affirmed the assessment. Respondent does not attempt to sustain the trial court's reversal of the assessment on the grounds stated in its request for hearing. Instead it now contends that its purchases of fuel oil were exempt under Section 144.030.3(1), which exempts " * * * Materials, manufactured goods, machinery and parts which when used in manufacturing, processing, compounding, mining, producing or fabricating become a component part or ingredient of the new personal property resulting from such manufacturing, processing, compounding, mining, producing or fabricating and which new personal property is intended to be sold ultimately for final use or consumption; * * * ."

■ Appellant contends that the fuel oil did not "become a component part or ingredient" of the briquettes and that the exemption relied upon is inapplicable. Respondent's argument ignores this portion of the exemption and is directed at the use of the word "processing." However, the statute clearly does not provide an exemption for materials solely on the grounds that they are used for processing. The further "component part" requirement must be met and the oil used by respondent does not meet that requirement.

Respondent relies on the holding in *State ex rel. Drum Service Company of Florida v. Kirk*, 234 So.2d 358 (Fla.1970), as a comparable case because it involved fuel oil employed by a processor of steel drums to fire blast drums. The purchases of fuel oil there were held excluded but the statute contained a provision not found in the Missouri law which excluded not only purchases of material which became a component part of a finished product but also of material " * * * used directly and immediately dissipated in fabricating, converting or processing such materials or parts thereof, * * * ." § 212.02(3)(c), F.S.A. Such provision, the basis for the holding in *Drum Service*, renders that decision obviously of no value in determining the issue here presented.

The trial court erred in reversing the assessment for tax on fuel oil purchases.

The judgment of the circuit court is reversed and the cause remanded with directions to remand the assessment to the Department of Revenue for further proceeding and the entry of a new assessment.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.

ON MOTION FOR REHEARING

PER CURIAM:

■ In its motion for rehearing, respondent argues that, with respect to the film bags, the Court overlooked its claim that purchases of these items were exempt under Section 144.615(6), RSMo. 1969, as "Tangible personal property held by processors, * * * manufacturers, * * * solely for resale in the regular course of business." The hearing officer determined the taxability of this item on the basis presented by the taxpayer's request for review which was required to state " * * * the reasons why a hearing should be granted * * *." § 144.680, RSMo 1969 (now repealed, Laws of Mo.1978, p. 441, § 1). Film bags were not specifically mentioned in the request for hearing and the hearing officer considered them under the general claim of exemption under Section 144.030.-3(1). His finding on that issue was the subject of the review in the circuit court and in this Court. A reviewing court has no authority to grant relief on grounds neither presented to nor considered by the Director.

Respondent also suggests that the case of *Smith Beverage Co. of Columbia, Inc. v. Spradling*, 533 S.W.2d 606 (Mo.1976), would authorize this Court to remand the issue of exemption of pallet purchases to the Director of Revenue for the taking of additional evidence. *Smith* was an action for declaratory judgment regarding the validity of a rule of the Director of Revenue. It was determined adversely to the Director of

Revenue in the trial court. Upon review, the Court found the record totally lacking in evidence to support the trial court's conclusion, no evidence having been offered pertinent to the issue presented. The judgment was reversed and the cause remanded with suggestions as to what evidentiary matters should be covered on a trial.

 This case is in a different posture. Respondent requested a hearing before the Director and was given the opportunity to support its claim for exemption. Except for the findings of the hearing officer, this Court does not know what evidence was actually heard on the issue. In the absence of a transcript, the parties stipulated that the findings of the hearing officer should provide the basis for judicial review. Review of such findings in this Court led to the conclusion that respondent had not met its burden of establishing its claim for exemption. In these circumstances, a further hearing on the issue is not in order.

Motion for rehearing overruled.