

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| **DREYER ELECTRIC CO., LLC,** | ) | *Opinion issued June 16, 2020* |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **v.** | ) | **No. SC98007** |
| | ) | |
| **DIRECTOR OF REVENUE,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Petition for Review of a Decision of the Administrative Hearing Commission
The Honorable Renee T. Slusher, Commissioner**

The Director of Revenue petitions this Court for review of the decision of the

Administrative Hearing Commission (AHC) that equipment purchased by Dreyer Electric

Co., LLC, was exempt from sales tax because it was "replacement equipment" "used

directly in the manufacturing process," as those terms are used in section 144.030.2(5).[1]

For the reasons set forth below, this Court reverses the decision and remands the case for

a redetermination of Dreyer's tax liability.

The Director is incorrect in arguing the AHC should have applied the exemption

---

[1] Effective August 2018, section 144.030.2(5) was amended and is currently codified at section 144.030.2(4). Citations in this opinion are to the 2016 version of the statute that was in effect at the times relevant to this case. Other statutory citations are to RSMo

only to replacement equipment used to transform raw materials into a finished product. This Court rejected that test in *Floyd Charcoal Co. v. Director of Revenue, 599 S.W.2d 173, 177 (Mo. banc 1980)*, and reaffirms its holding today. The AHC correctly applied *Floyd Charcoal*'s three-factor "integrated plant" test to determine whether the replacement parts and equipment at issue were "used directly in manufacturing." But the AHC then erred by making specific findings as to *some* parts and then grouping all the parts together, including those it had not discussed, to find they were collectively integral to the electrical system that powered the machinery. It should have considered whether *each* type of equipment was independently exempt under the integrated plant doctrine. This Court, therefore, reverses and remands for application of the "integrated plant doctrine" test to each type of replacement part or equipment purchased.

## I.     *FACTUAL AND PROCEDURAL BACKGROUND*

B&B Timber Company is a sawmill that manufactures flooring, railroad ties, pallet materials and other timber products using multiple pieces of equipment. Much of this admittedly exempt equipment, such as the debarker, the chain rollers, the saws, and the grinders and chippers, is located in building A and requires electricity to run. After a fire in August 2016, B&B rebuilt building A and other facilities. B&B hired Dreyer to install a new electrical system for the building. This required Dreyer to buy and install a wide variety of equipment such as wiring, electrical outlets, and safety equipment the electric company required for safe manufacturing. Equipment purchased included "soft starters" that cause the machinery to draw power slowly to avoid a sudden surge of power

---

2016 unless otherwise noted.

that could cause other electric customers to experience service disruptions; a 1,200 amp disconnect service that provides circuit breakers for various machines in the event of a malfunction; and a NEMA overload relay to stop the machinery in the case of overheating, as well as all conduits, couplings, ground rods and cables, washers, connectors and disconnectors, and a variety of other equipment. Together these items and systems comprise the "disputed parts."

After Dreyer completed the work, B&B gave Dreyer a tax-exemption certificate describing the equipment installed as "electrical panels, starters, wiring, motors, support material." Describing the disputed equipment as permanent electrical components that direct and manage the electric current to each of B&B's machines used in the manufacturing of its products or to protect the motors used to operate the machinery, Dreyer submitted a claim seeking a refund of the $6,366.61 it had paid in sales tax on the disputed equipment, which it said was replacement equipment used directly in manufacturing B&B's wood products and exempt from tax under section 114.030.2(4).

The Director denied the claim, believing the items were not replacement equipment directly related to manufacturing. Dreyer petitioned the AHC for review. Dreyer presented evidence that most of the items were used either to provide power to the machines manufacturing B&B's products, or to safely disconnect them in the event of a problem, and that they were needed to safely power the manufacturing machinery. The AHC determined the "disputed items" were replacement equipment "because they are a combination of parts that work together to create an electrical system designed specifically for B&B's manufacturing machinery" and were "necessary in order for B&B

3

to manufacture its products." The AHC also found the disputed items "were physically and causally close to B&B's manufacturing machinery." It rejected the Director's argument that equipment used to distribute or transmit electricity cannot be used directly in manufacturing, finding unpersuasive the Director's analogy to *Emerson Electric Co. v. Director of Revenue, 204 S.W.3d 642 (Mo. banc 2006)*, and *Utilicorp United, Inc. v. Director of Revenue, 75 S.W.3d 725 (Mo. banc 2001)*. In *Emerson Electric*, the equipment was used only to prepare for, or as a prelude to, manufacturing. *204 S.W.3d at 646*. In *Utilicorp,* this Court determined electricity was not being used as part of the manufacturing process itself. *75 S.W.3d at 730*. Here, the AHC found B&B used the electrical equipment directly in manufacturing products to "ensure that the machine motors operate, are protected from electrical spikes, do not overheat, and are directly wired into machine motors."

Based on this assessment, the AHC held all of the electrical equipment was directly related to manufacturing and found in Dreyer's favor for the full amount of the claimed exemption. The Director seeks this Court's review. This Court has exclusive jurisdiction in all appeals involving the construction of Missouri's state revenue laws. *Mo. Const. art. V, § 3*. "A 'revenue law' is [a state law] that imposes, amends, or abolishes a tax or fee." *Armstrong-Trotwood, LLC v. State Tax Comm'n, 516 S.W.3d 830, 834 (Mo. banc 2017)*.

## II.     *STANDARD OF REVIEW AND BURDEN OF PROOF*

"This Court will affirm a decision of the AHC if it: (1) is authorized by law; (2) is supported by competent and substantial evidence on the whole record; (3) does not

violate mandatory procedural safeguards; and (4) is not clearly contrary to the General Assembly's reasonable expectations." *Bus. Aviation, LLC v. Dir. of Revenue, 579 S.W.3d 212, 215 (Mo. banc 2019)*; *§ 621.193*; *Mo. Const. art. V, § 18*. This Court does not uphold a decision of the AHC if it is "arbitrary, capricious, unreasonable, unlawful, or in excess of jurisdiction." *Myron Green Corp. v. Dir. of Revenue, 567 S.W.3d 161, 164 (Mo. banc 2019)*. This Court reviews the AHC's legal decisions *de novo*. *Id.* "This Court is not bound by the [AHC]'s interpretation and application of the law." *Gervich v. Condaire, Inc., 370 S.W.3d 617, 620 (Mo. banc 2012)*.

"Taxing statutes must be strictly construed in favor of the taxpayer and against the taxing authority." *Bartlett Int'l, Inc. v. Dir. of Revenue, 487 S.W.3d 470, 472 (Mo. banc 2016)*. "Tax exemptions or exclusions, on the other hand, must be strictly construed against the taxpayer, and any doubt must be resolved in favor of the application of the tax." *Id.*

## III. DISPUTED PARTS MUST BE ANALYZED INDIVIDUALLY

At issue is whether some or all of the replacement equipment Dreyer purchased for B&B qualified for a tax exemption under section 144.030.2(5). When the items were purchased in 2016, the statute exempted from sales tax:

> Replacement machinery, equipment, and parts and the materials and supplies solely required for the installation or construction of such replacement machinery, equipment and parts, used directly in manufacturing … a product ….

In the proceedings before the AHC, the Director contended the disputed items were not replacement equipment or parts, and, even if they were, they were not used

5

directly in manufacturing a product. In this Court, the Director contends only that the equipment and parts were not "used directly in manufacturing." It is to the meaning of the latter phrase, therefore, that this Court turns.

The Director contends the phrase should be interpreted according to the dictionary definition of "direct" to include only items used in the actual machines that transform the wood into products. It should not, the Director argues, apply to equipment that allows the machines to operate safely and that provides power to them because:

> Some of these items work to deliver and control power to the manufacturing machinery; other items are required by the electric company solely for safety reasons and are not necessary to power the equipment. The items that work to deliver and control power, while necessary, are causally one step removed from the actual manufacturing process itself and thus are not exempt under the manufacturing statute.

Relying on cases decided by states such as Georgia and Ohio, the Director argues such equipment and parts should not be exempt because they are not "directly involved in the alteration of the graded logs into the final products that B&B produces" and "do not cause a change to any raw materials and are not a part of the production line."

As the Director recognizes elsewhere in his brief, however, the meaning of "used directly in manufacturing" is determined not by separating out and defining each word of the phrase independently but by looking at the statutory language as a whole in light of its legislative purpose. Undertaking just such an analysis, this Court expressly rejected in *Floyd Charcoal* an argument nearly identical to the one the Director makes today. The issue in *Floyd Charcoal* was how to determine whether replacement parts and equipment used in manufacturing charcoal came within the definition of "used directly in

6

manufacturing." *599 S.W.2d at 176*. In *Floyd Charcoal*, as here, the Director relied on the laws of Georgia and Ohio to argue for a narrow definition of that phase, asserting only equipment that produced a change in the composition of the raw materials was directly related to manufacturing and the phrase, therefore, excludes other equipment. *Id.*

This Court rejected the Director's argument, stating it was based, at best, on outdated methods of manufacturing and failed to consider that "[m]odern manufacturing facilities are designed to operate on an integrated basis." *Id. at 178*. A machine cannot change a raw product into a finished one by itself; rather, today's machines are integrated with other machinery that is also essential to the process. For this reason, "[t]o limit the exemption to those items of machinery or equipment which produce a change in the composition of the raw materials involved in the manufacturing process would ignore the essential contribution of the devices required for such operation." *Id.*

*Floyd Charcoal* instead adopted the broader test it called the "integrated plant rule" – which since has been referred to as the "integrated plant doctrine." That doctrine, *Floyd Charcoal* said, was more consistent with the Missouri legislature's intent "to encourage the location and expansion of industries" in the state by providing an exemption for replacement equipment and parts used directly in manufacturing. *Id. at 177*. In applying this broader test to determine whether a particular part or process falls within the statutory exemption, a court should consider three questions:

> (1) Is the disputed item necessary to production? (2) How close, physically and casually, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?

7

*Id.* In *Floyd Charcoal*, the issue was the taxability of various pieces of replacement equipment used to manufacture charcoal, including a starch system (consisting of conveyer belts and storage bins), weight scales, a sacking system and filter, a check weight system, pallets, plastic bags, and stairways and ramps. *Id. at 175*.

*Floyd Charcoal* did not apply the integrated plant doctrine by deciding whether the equipment as a whole was used directly in manufacturing. Instead, it looked at each type of equipment and considered whether it qualified for the exemption. This Court first considered and rejected the Director's argument that the starch system was not directly related to manufacturing charcoal because charcoal could be produced without it. *Floyd Charcoal* held the starch system was used directly in manufacturing because it "contributes to the continuous flow process … and that process requires the starch system." *Id. at 178*.

*Floyd Charcoal* then considered and rejected the Director's argument that the equipment used in weighing and sacking the charcoal could not be considered directly used in manufacturing because the charcoal was fully produced by the time it was weighed and sacked. This Court reasoned the charcoal is manufactured "for distribution and sale only in packages which must be accurately weighed and closed. Those steps are an integral part of the respondent's manufacturing process." *Id.* The Court found, however, that the company had not shown its pallets, fuel oil, ramps, and certain other equipment were used directly in manufacturing even though they were part of the process; therefore, the company failed to show these types of equipment were entitled to the exemption. *Id. at 178-81*.

8

This Court applied *Floyd Charcoal*'s integrated plant doctrine in *Southwestern Bell Telephone Co. v. Director of Revenue, 182 S.W.3d 226, 233-34 (Mo. banc 2005)*. The question in *Southwestern Bell* was whether equipment used in the telephone system was directly related to manufacturing. *Id at 229.* The disputed items included a signals system with components at both the company's warehouse and the customer's home and also included pay telephones. *Id at 233-37.* Because the telephone signal system performed sending functions at the plant and receiving functions at the customer's location, the Director argued the system did not meet the prong of the integrated plant doctrine that asks "how close, physically and casually" the disputed item is to the finished product. *Id. at 232-33.*

*Southwestern Bell* rejected the Director's argument, stating, "The multitude of component parts of the telephone system are necessarily spread over far distances, but they are not scattered and unconnected." *Id. at 233.* "Nothing in [the location] question requires claimed machinery and equipment to be located in the same building or to have common ownership to qualify for the exemption." *Id.* "The end product of telephone service could not be produced without the conversion of voice-to-signal and signal-to-voice that occurs at customers' premises." *Id.* "[T]he manufacture of telephone services occurs throughout the entire telephone system, not only at customers' locations." *Id.* "[T]he entire system operates continuously along pathways formed by much of the equipment at issue in this case." *Id.* For these reasons, this equipment was exempt.[2]

_____

[2] When the legislature amended section 144.030 in 2018, it stated it was abrogating the holding of *IBM Corporation v. Director of Revenue, 491 S.W.3d 535 (Mo. banc 2016)*, to

This Court reached a different result when considering the pay telephones the company claimed were similarly exempt. It found these telephones were taxable because they "are not absolutely essential to the provision of telephone service, and are not closely connected to those portions of the system that actually effect a change in the signals[.]" *Id.*

In sum, whether a particular component of a system qualifies for the exemption depends on whether that component satisfies the broad three-part "integrated plant" test set out in *Floyd Charcoal,* not the narrow test argued for by the Director and rejected in *Floyd Charcoal.* The Director is correct, however, that, under the integrated plant doctrine, the exemption of one type of replacement equipment, such as the soft starters, does not exempt all equipment purchased for the system. As is evident from the above explanation of the approach taken in *Floyd Charcoal* and *Southwestern Bell*, exemptions are determined by applying the three-part test to the particular type of replacement equipment at issue.

Applying these principles here, this Court rejects the Director's arguments that items such as the circuit breakers, soft starters, and overload relays are not directly used in manufacturing because wood products theoretically can be manufactured without them. The AHC found this equipment was necessary to operate the wood-making

---

the extent *IBM* disapproved the application to telecommunications services of the broad reading of "used directly in manufacturing" this Court applied in *Southwestern Bell* and its predecessor case *Southwestern Bell Telephone Co. v. Director of Revenue, 78 S.W.3d 763 (Mo. banc 2002).* This instant case, of course, does not concern telecommunications equipment; therefore, *IBM*'s discussion of the application of the integrated plant doctrine to such equipment would not govern here.

machinery safely and without overloading the electrical system. The AHC similarly found the starters, connectors and disconnectors, and power and control wires were necessary to deliver power to the manufacturing equipment. Clearly, under the reasoning of the cited cases, such equipment is a part of an integrated process that is necessary to the production of B&B's wood products and so is exempt.

By contrast, the Director is correct that electric outlets, lights, and lamps not used in powering the plant and heat for the buildings generally is not a part of the integrated process used to produce B&B's products and so is not exempt because they do not "operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system" and are not necessary to operate the equipment.[3]

The AHC failed to mention other replacement equipment specifically in its decision, seeming to assume that, because the major equipment purchased was exempt, every item purchased was exempt. This Court, therefore, remands so the AHC can apply the analysis approved in cases such as *Floyd Charcoal* and *Southwestern Bell* to the remaining types of replacement equipment to determine if they are used directly in manufacturing like the soft starters or, instead, are simply of general use to B&B, such as electrical outlets, but are not used directly in manufacturing.[4]

_____

[3] Dreyer also installed a heating element, which the Director alleges is used to heat the building where the machinery is housed and, therefore, is not exempt, but which Dreyer alleges is a heating element for the NEMA overload relay and, therefore, is exempt. Because the Court is remanding this cause, it need not resolve this disagreement.

[4] Dreyer seems to assume this Court will treat the tax as either owing or not owing as a whole, so it is not worthwhile to require the Director to apply the integrated plant doctrine to the small amounts spent on other equipment. While, as noted, this is incorrect, it does raise the question why either the Director or Dreyer believed the small sum

11

## IV.    CONCLUSION

For the reasons set forth above, the AHC's decision is reversed, and the cause is remanded for further proceedings in accordance with this opinion.

_____
**LAURA DENVIR STITH, JUDGE**

All concur.

---

involved was worth their presumably much higher expense in litigating this issue or worth the time involved for the AHC or this Court in resolving it.  This Court will assume the parties are concerned that the principles involved need clarification and could have broad application beyond the facts of this seemingly minor dispute.