In the Matter of NIAGARA MOHAWK POWER CORPORATION, Petitioner, against GEORGE W. WANAMAKER, as Director of Erie County Sales Tax, Respondent.

Fourth Department, September 21, 1955.

*Daniel G. Yorkey, James A. O'Neill* and *Donald F. Runyan* for petitioner.

*Elmer R. Weil, County Attorney (Maurice J. Rumizen* and *John S. Ryan* of counsel), for respondent.

VAUGHAN, J.   This is an article 78 proceeding, transferred to this court pursuant to section 1296 of the Civil Practice Act, to review the determination of respondent, as Director of Sales Tax of Erie County, to the effect that petitioner is indebted to the Department of Sales Tax in the sum of $67,000 for unpaid sales and compensating use taxes.  The Erie County Sales Tax Resolution (§ 1, subd. [g]) and Use Tax Resolution (§ 1, subd. [d]) do not tax the purchase of tangible personal property for either of the following purposes: " (1) for resale in the

form of tangible personal property; or (2) for incorporation of such property as a material or a part into or for use or consumption directly and exclusively in the production of tangible personal property to be produced for sale by manufacturing, processing * * *." The phrase " tangible personal property " is defined in the enabling act to include electricity (L. 1947, ch. 278, as amd. by L. 1948, ch. 651 and L. 1950, ch. 589).

At its Huntley steam station in Erie County petitioner generates electricity. Large quantities of coal are consumed in a boiler, the steam from which operates a turbine-generator unit. The latter produces electricity at 13,000 volts. The coal, boiler, turbine and generator are concededly used " directly and exclusively in the production " of electricity. They are, therefore, not taxable. The disputed items at the Huntley steam station are chiefly of two kinds: (1) Various coal and ash handling equipment. This includes the crane and car dumper which unload incoming coal; the conveyor belts which move it along toward the boiler; the crushers, sprayers and metal detectors which process the coal as it moves along the belts, and the slag lines and pumps and narrow gauge railway which carry the ash and slag from the boiler. (2) Various structures. This includes concrete caissons and foundations which support the machinery; the steel superstructure which braces and steadies the same, and the building which houses the entire plant. Respondent contends that these items are not used or consumed " directly and exclusively " in the production of electricity for sale. Petitioner replies that if there were a breakdown in the conveyor system which transports coal to the boiler, in the structures which support the boiler and other machinery, or in the equipment which carries off the waste slag and ash, the production of electricity would cease within a matter of hours.

One purpose of the sales and use tax resolutions is to reduce multiple taxation. The burden would be excessive if purchases for resale were taxed numerous times during the journey of goods to the ultimate consumer. The economic effect is no different where the tax is on raw materials or machines directly and exclusively used or consumed in production. If the policy of avoidance of multiple taxation were pursued to its natural and logical limits, all purchases by petitioner would be exempt to the extent that the Public Service Commission permits their inclusion as items of cost in fixing rate base. When sales taxes paid by the utility become a component of the final cost of electricity, the residential consumer pays a tax on a tax. The resolutions, however, strike a balance between the policy of avoiding

multiple taxation and the need for raising revenue. Our task is to decide where that balance lies.

There is no simple test of what constitutes " consumption directly and exclusively in the production " of electricity. The basic questions are the following: (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?

After much study of the matter, we have concluded that the purchase or use of the coal and ash handling equipment is not taxable. That equipment is as essential to production as the generator itself. A serious breakdown in it would quickly stop or impair the output of electricity. We are further impressed with the synchronization and integration of the boiler and coal and ash equipment. The one could not operate without the other. Working together they make up a system which supplies the power from which electricity is produced. A taxing statute should receive a practical construction (*Matter of Mendoza F. D. Works.* v. *Taylor,* 272 N. Y. 275, 281). That is particularly true here, for the resolutions are designed to achieve a practical, economic result — avoidance of multiple taxation, at least to some extent. It is not practical to divide a generating plant into " distinct " stages. It was not built that way, and it does not operate that way. The words " directly and exclusively " should not be construed to require the division into theoretically distinct stages of what is in fact continuous and indivisible.

We have also concluded that the structures at the Huntley steam station are not subject to the sale and use taxes. The structures and supports which house and steady the machinery are essential to production. They are physically annexed to the machinery, specially designed therefor, and necessary to the proper functioning thereof. As a whole, the plant is a producing unit. The structures do not play as active a role as, for example, the turbine. But activity is not the test of directness. The walls of the boiler have a " passive " function in one sense. The important thing is that all parts of the plant contribute, continuously and vitally, to production, and they are all integrated and harmonized. Respondent objects that the building which encloses the machinery is not used " exclusively " in production because it contains offices and locker rooms. In terms of volume, an extremely small portion of the building is devoted to such uses. The offices and locker rooms do not alter the

fundamental design of the plant. Petitioner insists that there should be a '' principal use '' test of '' exclusively.'' If that is a distortion of language, still there must come a point where it is true (cf. *People ex rel. Delta Kappa Epsilon Soc.* v. *Lawler,* 74 App. Div. 553, 557, affd. 179 N. Y. 535). For example, if the building were otherwise exempt, it would not become taxable because high school students visited it on an educational tour. We think the use of the building for nonproductive purposes is too minor to be regarded.

The generator at the Huntley steam station produces electric energy at 13,000 volts. Transformers at the station immediately increase the voltage to 23,000 or 115,000 volts. It appears that 99% of petitioner's customers require electricity at either 120 or 240 volts. Electricity. is distributed to them at those voltages by means of an elaborate system of sub-stations, transformers, towers and poles, conductors, voltage regulators, circuit breakers·and similar equipment. All of those items are also in dispute. While the vast majority in number of petitioner's customers consume electricity at 120 or 240 volts, by far the greatest part of its product is sold to certain large industrial consumers, and the greatest part of its revenue is derived from those sales. Those industrial consumers purchase electricity at the voltages put out by the Huntley transformers. They do not consume it at those voltages, however; instead they reduce the voltage in their own transformers, usually to 480.

The above-disputed items can be discussed together. If, as we believe, the transformers at Huntley are used in transmission or distribution, rather than in production, the same conclusion follows with respect to conductors, towers, sub-stations and all subsequent auxiliary equipment. Petitioner's argument has been that since 99% of its customers cannot consume electricity except at 120 or 240 volts, and since electricity at a higher voltage is not saleable so far as they are concerned, the process of production for sale is incomplete until those voltages are achieved in the pole type transformers. This argument is weakened by the fact that most of petitioner's product is purchased at 115,000 or 23,000 volts, precisely as it leaves the Huntley transformers. All subsequent equipment is used in transmission or distribution so far as the industrial consumers are concerned. A transformer does not and cannot increase the amount of electric energy. The maximum amount of energy has been produced when the current leaves the generator. Thereafter, there is a continuous loss of energy. Transformers facilitate transmission by reducing the loss of electric energy and the

amount of expensive copper wire required. Production stops at the generator, which produces electricity at a voltage which is (1) already too high so far as the residential consumers are concerned, and (2) saleable so far as concerns the industrial consumers which take the bulk of petitioner's product. The generator puts out electricity at 13,000 volts, which the transformers immediately increase to 23,000 and 115,000 volts. The factories purchase electricity at those voltages, although they consume at less than 13,000 volts. Certainly so far as they are concerned, the transformers are used in distribution. With respect to the residential consumers, the question may be asked, why does petitioner increase the voltage from 13,000 volts? That is already more than they can use. The reason for the increase involves economics of transmission and distribution. The voltage is radically increased, and then gradually decreased, simply to facilitate distribution. We conclude that the disputed items subsequent to the generator are used in the distribution and not in the production of electricity. (*Peoples Gas & Elec. Co.* v. *State Tax Comm.*, 238 Iowa 1369; *Utah Power & L. Co.* v. *Pfost*, 286 U. S. 165.) They are so treated for accounting purposes (5 N. Y. Official Compilation of Codes, Rules & Regulations, pp. 732–733).

The determination should be annulled and the matter remitted to the Director of Erie County Sales Tax for further proceedings not inconsistent with this opinion.

All concur. Present — McCurn, P. J., Vaughan, Kimball, Wheeler and Van Duser, JJ.

Determination annulled on the law, without costs, and matter remitted to the Director of Erie County Sales Tax for further proceedings not inconsistent with the opinion herein.