**SOUTHWESTERN BELL
TELEPHONE COMPANY, Respondent,**

v.

**DIRECTOR OF REVENUE, Appellant.**

No. SC 86441.

Supreme Court of Missouri,
En Banc.

Dec. 20, 2005.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Jefferson City, for appellant.

Ann K. Covington, B. Derek Rose, St. Louis, Edward F. Downey, Jefferson City, for respondent.

MARY R. RUSSELL, Judge.

The Director of Revenue seeks review of the Administrative Hearing Commission's ("AHC") decision granting Southwestern Bell Telephone Company a refund of $598,944.14, plus interest, in use tax paid on purchases in the second quarter of 1992. The AHC's decision is affirmed in

part and reversed in part, and the cause is remanded.

## I. Jurisdiction and Standard of Review

 This Court has jurisdiction to review the AHC's decision pursuant to Mo. Const. art. V, section 3, as the case involves construction of the state revenue laws. The AHC's interpretation of revenue laws is reviewed *de novo*. *DST Sys., Inc. v. Dir. of Revenue*, 43 S.W.3d 799, 800 (Mo. banc 2001). The AHC's factual determinations will be upheld if the law supports them and, after reviewing the whole record, there is substantial evidence that supports them. *Id.*

 A taxpayer carries the burden of showing they are entitled to an exemption under the statutes. *Branson Props. USA, L.P. v. Dir. of Revenue*, 110 S.W.3d 824, 825 (Mo. banc 2003). Exemptions from taxation are to be strictly construed against the taxpayer, and any doubt is resolved in favor of application of the tax. *Id.*

## II. Background

Bell seeks a refund of the use tax it paid on machinery and equipment used to produce basic and vertical telephone services. Bell contends it is entitled to a refund under sections 144.030.2(4) and (5), RSMo Supp.1992,[1] which provide sales and use tax exemptions for certain machinery and equipment "used directly" in manufacturing a product intended for final use or consumption.[2]

Director denied Bell's refund claim, and Bell sought review of that decision from the AHC. The AHC affirmed Director's denial of the refund, finding that Bell did not qualify for a manufacturing exemption because telephone service was not a manufactured product. The AHC also found that, even if Bell were engaged in manufacturing, its purchases did not qualify for the exemption because the legislature had not intended for all telephone components to be exempt as "used directly" in manufacturing.

Bell sought review of the AHC's decision. In *Southwestern Bell Telephone Co. v. Director of Revenue*, 78 S.W.3d 763 (Mo. banc 2002) (hereinafter *"Bell I"*), this Court held that Bell's telephone services constituted the manufacturing of a product intended for final use and consumption for purposes of the sales and use tax exemptions.[3] *Bell I*, 78 S.W.3d at

---

1. All further references are to RSMo Supp. 1992 unless otherwise indicated.

2. Section 144.030.2(4) provides an exemption for:

> Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, replaced and used for the same purposes as the machinery and equipment replaced by reason of design or product changes, which is purchased for and used directly for manufacturing or fabricating a product which is intended to be sold ultimately for final use or consumption[.]

Section 144.030.2(5) provides an exemption for:

> Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery and equipment is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption[.]

The current versions of these sections are not materially different as applicable to the issues in this case.

3. A basic overview of the mechanics of the telephone system can be found in *Bell I*, 78 S.W.3d at 764–65.

767–68 (holding Bell's basic telephone services and various vertical services are intangible products that are manufactured). This Court, however, remanded to the AHC for further fact-finding as to whether Bell's purchases were qualifying machinery and equipment under sections 144.030.2(4) and (5). *Bell I*, 78 S.W.3d at 768.

On remand from *Bell I*, the AHC ruled in Bell's favor. The AHC concluded that all of Bell's purchases were machinery and equipment "used directly" in manufacturing such that they qualified for the use tax exemption and, therefore, Bell was entitled to its full refund claim of $598,944.14. The AHC noted that Director had conceded that certain purchases—mostly switching components and central office equipment—were not taxable, leaving a challenged amount of $242,328.63.[4] Director now seeks review of the AHC's decision on remand.

In *Bell I*, this Court remanded to the AHC so that it could review the evidence to determine if Bell's claimed purchases were for "machinery and equipment, or materials and supplies solely required for the installation or construction of such machinery and equipment." *Id.* Under the plain language of sections 144.030.2(4) and (5), however, this review necessarily required the AHC to determine if the purchases at issue were "used directly" in manufacturing. Under the statute, purchases *must* be "used directly" in order to qualify for the exemption.

Director challenges the AHC's conclusion that Bell's purchases are "used directly" in manufacturing. In reviewing the AHC's decision on remand, this Court must determine if the AHC erred in finding that all of Bell's purchases were machinery and equipment "used directly" in its manufacture of basic and vertical telephone services.

## III. What is "used directly"?

The standard for determining what is "used directly" in manufacturing has evolved as manufacturing itself has changed from traditional rust-belt factories to industries that are increasingly reliant on what the AHC appropriately calls "technology of a new millennium." Keeping pace with modern industry, especially in information and communication technologies, has required consideration of how the manufacturing exemption applies to intangible products or services. *Bell I*, 78 S.W.3d at 766. As technology has evolved, consideration has been given to how the manufacturing exemption applies when a company's machinery and equipment is connected by telephone lines and via data processing connections. As noted in *Bell I*, this case requires " 'the application of a statutory framework that first took shape in the thirties and forties to [current] technology.' " *Id.* at 763–64 (quoting *Bridge Data Co. v. Dir. of Revenue*, 794 S.W.2d 204, 205 (Mo. banc 1990), *abrogated by Int'l Bus. Machs. Corp. v. Dir. of Revenue*, 958 S.W.2d 554 (Mo. banc 1997)).

The meaning of "used directly in manufacturing a product" was first addressed in *Floyd Charcoal Co., Inc. v. Director of Revenue*, 599 S.W.2d 173, 176 (Mo. banc 1980), *abrogated on other grounds by Al–Tom Inv., Inc. v. Dir. of Revenue*, 774 S.W.2d 131 (Mo. banc 1989). In *Floyd Charcoal*, this Court adopted the "integrated plant" theory[5] for determining

4. The AHC's decision first cites the contested amount as $242,328.63, but later concludes that Director contested only $242,241.96, having conceded $356,702.18 of Bell's refund claim.

5. The "integrated plant" theory was first developed in *Niagara Mohawk Power Corp. v.*

what is "directly used" in manufacturing. 599 S.W.2d at 177–78.

The "integrated plant" theory stresses that:

'The basic questions are the following: (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?

. . . .

It is not practical to divide [the] plant into 'distinct' stages. It was not built that way, and it does not operate that way. The words 'directly and exclusively' should not be construed to require the division into theoretically distinct stages of what is in fact continuous and indivisible.'

*Id.* at 177 (quoting *Niagara Mohawk Power Corp. v. Wanamaker,* 286 A.D. 446, 144 N.Y.S.2d 458, 461–62 (1955), *aff'd,* 2 N.Y.2d 764, 157 N.Y.S.2d 972, 139 N.E.2d 150 (1956)).

*Floyd Charcoal* rejected the argument that equipment could not qualify for the manufacturing exemption if it did not produce a change in the composition of raw materials involved in the manufacturing process, stating:

Modern manufacturing facilities are designed to operate on an integrated basis . . . . [and] limit[ing] the exemption to those items of machinery or equipment which produce a change in the composition of the raw materials involved in the manufacturing process would ignore the

essential contribution of the devices required for such operation.

*Floyd Charcoal,* 599 S.W.2d at 178.

*Floyd Charcoal* also rejected the contention that the relevant question was "whether or not the manufacturing operation may be carried on without the machinery in question," because "[s]uch a test does not comport with the reality of the process involved." *Id.*

*Floyd Charcoal's* adoption of the three-prong "integrated plant" theory approach was consistent with the purpose of Missouri's manufacturing exemption, which was enacted by the legislature to encourage the production of items ultimately subject to sales tax and to encourage the location and expansion of industry in Missouri. *Id.; Concord Publ'g House, Inc. v. Dir. of Revenue,* 916 S.W.2d 186, 190 (Mo. banc 1996). The exemption reduces multiple taxation that occurs where purchases for resale are taxed numerous times during the journey of goods to the ultimate consumer, such that the tax paid by the manufacturer is passed on to the consumer, who is, in turn, effectively taxed on a tax.

Since *Floyd Charcoal,* other cases have considered the "integrated plant" theory in deciding whether items are "used directly" in manufacturing such that they are exempt from sales and use tax.

The "integrated plant" theory as adopted in *Floyd Charcoal* was applied in *Noranda Aluminum, Inc. v. Missouri Department of Revenue,* 599 S.W.2d 1 (Mo. 1980), wherein this Court discussed that the equipment at issue was "used in steps or operations that are essential to and comprise an integral part of [the] manufacturing process, and [was, therefore,] used

*Wanamaker,* 286 A.D. 446, 144 N.Y.S.2d 458 (1955), *aff'd,* 2 N.Y.2d 764, 157 N.Y.S.2d 972,

139 N.E.2d 150 (1956).

directly for manufacturing or fabricating a product...." *Noranda,* 599 S.W.2d at 4 (internal citations omitted).

*Concord,* 916 S.W.2d 186, reiterated that *Floyd Charcoal* had rejected strict interpretation of the phrase "directly used" to exempt only machines that physically alter raw materials to a finished product. *Concord,* 916 S.W.2d at 191–92. It asserted that "Missouri has adopted the integrated plant doctrine, viewing manufacturing operations as continuous and indivisible." *Id.* at 191 (internal citations omitted). In *Concord,* computers used in manufacturing [6] a newspaper were determined to be "directly used in manufacturing because they [were] an integral part of the publication process" and provided "the most important step in manufacturing a newspaper, the composition and editing of its contents." *Id.* at 192.

In holding that the computers were exempt in *Concord,* this Court found the "integrated plant" doctrine can apply where two distinct corporations are cooperatively involved in manufacturing because it can "span two corporate entities as long as both businesses work together to manufacture a single product" and the "exchange between [the two corporations] occur[s] as a coordinated and necessary step in the manufacturing process." *Id.* at 192–93.[7]

*Concord* also found that physical distance between the claimed computers and other manufacturing equipment was a factor to consider in determining if the computers were an integral part of manufacturing, but it was not a determinative factor. *Id.* at 193. *Concord* noted that because the computers were essential to manufacturing, their physical distance from other equipment did not break the direct tie required for the manufacturing exemption to apply. *Id.*

Similarly, in *DST Systems,* a computer system was found to be part of an "integrated plant" for producing printed statements via a subsidiary, even though the printing and computing occurred at different sites. 43 S.W.3d at 803.[8] *DST Systems* discussed that the "integrated plant" doctrine views manufacturing operations as "continuous and indivisible" and found that DST's equipment was exempt because it was "substantially," though not exclusively, used for manufacturing the products and was "an integral part in producing the ultimate product." *Id.*

The most recent case discussing the "integrated plant" theory is *Utilicorp United, Inc. v. Director of Revenue,* 75 S.W.3d 725 (Mo. banc 2001). *Utilicorp* concluded that electricity transmission and distribution equipment is not part of an "integrated plant," because the equipment essentially repackages an existing product and, therefore, is not "used directly" in manufacturing. 75 S.W.3d at 728–29.

In this case, the AHC concluded that each category of equipment that Bell

---

**6.** This Court had already established that organizing information through computer technology is "manufacturing." *Bridge Data Co.,* 794 S.W.2d at 206.

**7.** *Concord* adopted the reasoning of *Central Paving Co. v. Idaho Tax Commission,* 126 Idaho 174, 879 P.2d 1107, 1110 (1994), which found: "If the statute's purpose is to exempt materials and equipment used in the manufacture of items ultimately sold at retail then it makes no difference whether the manufac-

turing process is contracted out to various parties who never obtain title to or ownership of the product being manufactured and items ultimately sold."

**8.** Entities work together to manufacture a single product when their equipment and machinery is integrated and synchronized for the purpose of manufacturing a product intended to be sold ultimately for final use or consumption. *DST Sys.,* 43 S.W.3d at 803.

claimed qualified for the manufacturing exemption because it was "used directly" in manufacturing.

## IV. Points on Appeal

### A. How broad is *Bell I's* definition of "manufacturing"?

Director first argues that the AHC erred in finding that Bell's telephone network equipment was "used directly in manufacturing" because the AHC too broadly interpreted this Court's holding in *Bell I* as to what part of telephone service constitutes manufacturing. She asserts that *Bell I* holds that the "product" that Bell "manufactures" is the reproduction of the human voice via transformation of voice to electronic signal, which occurs in customer-owned telephone sets on customers' premises.

Director incorrectly maintains that *Bell I* limits "manufacturing" in this case to the transformation of a voice that occurs in a customer's telephone set. *Bell I* held that "[b]asic telephone services and the various vertical services involved herein are intangible products that are manufactured." 78 S.W.3d at 768. *Bell I* makes no statement limiting Bell's manufacturing only to the conversion of voice to electronic signals. Instead, *Bell I* holds that the product that Bell manufactures is the ability to hear a reproduction of the human voice over appreciable distances. *Id.*[9]

While voice-to-signal and signal-to-voice transformations occur on customers' telephone sets, those transformations are val-

ueless unless the signals are moved over the distances between customers so that a reproduction of the voice ultimately can be heard. The components located at the customers' premises are the beginning and the end of the telephone system, but the customers' components cannot produce telephone service without Bell's components. To the extent that Director argues that Bell's middle-of-the-system components are not a part of the "manufacture" of telephone services as discussed in *Bell I* and, thereby, do not qualify for the manufacturing exemption, the arguments are without merit.

*Bell I's* holding remains: "[b]asic telephone services and the various vertical services involved herein are intangible products that are manufactured." 78 S.W.3d at 768. As such, the machinery and equipment used to provide these basic and vertical services could qualify for the manufacturing exemption, if all the required elements of the exemption are met. The AHC was instructed to determine on remand if Bell's claimed purchases were machinery and equipment that qualified for the exemption. To that end, the AHC was required to explore whether the claimed items were "used directly" in manufacturing.

### B. Did the AHC wrongly apply the "integrated plant" doctrine?

■ Director argues that the AHC wrongly applied the "integrated plant" doctrine to the telephone system because the system performs some functions at the

---

**9.** *Bell I* discusses that "manufacturing" has been defined as changing something unsuitable for common use to something of such common use or changing raw materials into products with intrinsic and merchantable value. 78 S.W.3d at 767. It notes that the manufacturing exemption applies to equipment that modifies a raw product to something of use and value, but not equipment that

is used after the finished product reaches the consumer. *Id.* In holding that even an intangible product like telephone service qualifies for the manufacturing exemption, *Bell I* expressly overruled *GTE Automatic Electric v. Director of Revenue*, 780 S.W.2d 49 (Mo. banc 1989), which had held that telephone services were not products for the purposes of the use tax exemption. *Bell I*, 78 S.W.3d at 768.

customer's location on the customer's equipment. She contends that "the AHC has taken the unprecedented step of permitting one of two unrelated persons operating in two different locations to invoke the [manufacturing] exception without the other" and urges this Court to "hold the 'integrated plant doctrine' within reasonable bounds."

■ In applying the "integrated plant" doctrine to the multitude of components that make up the entire telephone system, the AHC did not wrongly extend the doctrine's reach to "unrelated persons." The doctrine requires examination of location and ownership to the extent that it asks in its second prong, "How close, physically and causally, is the disputed item to the finished product?" Nothing in this question requires claimed machinery and equipment to be located in the same building or to have common ownership to qualify for the exemption.

In *Concord*, this Court held that the "integrated plant" doctrine could span two corporate entities as long as both worked together to create a single product and the exchange between them "occurred as a coordinated and necessary step in the manufacturing process." 916 S.W.2d at 192–93. The AHC's decision in this case is supported by *Concord*.

The end product of telephone service could not be produced without the conversion of voice-to-signal and signal-to-voice that occurs at customers' premises. As discussed above, however, the manufacture of telephone services occurs throughout the entire telephone system, not only at customers' locations. The multitude of component parts of the telephone system are necessarily spread over far distances,

but they are not scattered and unconnected. Instead, the entire system operates continuously along pathways formed by much of the equipment at issue in this case. In this case, like in *Concord*, two distinct entities are working together to create a single product in an integrated and coordinated process. Given this, the AHC did not err in applying the "integrated plant" doctrine to Bell's component parts of the telephone system to determine if they are "used directly" in manufacturing.

### C. Are pay telephone components "used directly" in manufacturing?

Director contends the AHC wrongly applied the "integrated plant" doctrine in concluding that Bell's pay telephone components qualified for the manufacturing exemption.[10] She argues that the AHC erred in concluding that these items qualified for the exemption because they "operate harmoniously" with Bell's manufacturing equipment. She asserts that prior cases have applied the "integrated plant doctrine" in a way that requires equipment to be used *in* manufacturing, not merely alongside or in connection with manufacturing.

■ The AHC found:
Although pay phones are not absolutely essential to the provision of telephone service, and are not closely connected to those portions of the system that actually effect a change in the signals, they 'operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system.' ... [I]tems such as pay telephone components should not be disqualified for the exemptions on grounds that they are not

---

**10.** These pay telephone components included the "little shelf where people can lay their belongings while they're talking on the phone" and "a sign that designates a pay phone that is belonging to [Bell]."

'directly used in manufacturing' the product.

The AHC's holding in this regard clearly conflicts with the three-prong test of the "integrated plant" doctrine adopted in *Floyd Charcoal,* which remains the test for determining whether machinery and equipment claimed under the manufacturing exemption is "used directly" in manufacturing.[11]

■ In applying the "integrated plant" doctrine, all three prongs should be examined before determining whether an item qualifies for the manufacturing exemption. If an item is not necessary to production, it cannot be exempt. If it is not close physically or causally to the end product, it cannot be exempt. If it does not operate with admittedly exempt items in an integrated and synchronized system, it cannot be exempt.

Although the AHC found that there was evidence to satisfy the last prong of the test, that cannot overcome its findings that the pay telephone components "are not absolutely essential" and "not closely connected" to production components.

The portions of the AHC's decision concluding that all pay telephone components are exempt are reversed, and the cause is remanded to the AHC for new findings and conclusions as to these claimed items. On remand, the AHC should consider all three prongs of the "integrated plant" doctrine with equal force.

### D. Does "vertical services" equipment qualify for the exemption?

■ Director argues that the AHC wrongly concluded that all of Bell's equipment used to provide "vertical services"[12] qualifies for the manufacturing exemption. She acknowledges *Bell I's* holding that "the various vertical services ... are intangible products that are manufactured," but again asserts that *Bell I* limits Bell's manufacturing to the "transformation of voice to electronic impulses" or the creation of "tones and other sounds that consumers use." She contends that Bell's vertical services cannot qualify for the manufacturing exemption unless they involve signal transformation or signal tones. She argues that vertical services that merely reproduce, not create, a signal[13] should not be exempt, nor should vertical services that occur only at the central switch and send no signals to customers.[14]

*Bell I* concluded that both basic telephone services and various vertical services are intangible products that are manufactured such that the manufacturing

11. " 'The basic questions are the following: (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?' " *Floyd Charcoal,* 599 S.W.2d at 177 (quoting *Niagara,* 144 N.Y.S.2d at 461).

12. Bell's vertical services are optional and are offered to customers for an additional charge. Customers pay sales tax on the vertical services they choose to purchase. Bell offers the following vertical services: Bill Plus, Customer Billing Report, Detailed Billing of Local

Measured Service, CABS Bills on Floppy Disk, Caller ID, Anonymous Call Rejection, Auto Redial, Call Blocker, Call Forwarding, Selective Call Forwarding, Remote Access to Call Forwarding, Call Return, Call Trace, Call Waiting, Priority Call, Speed Call, and Three-Way Calling.

13. Director states that the vertical services of Call Forwarding and Three-Way Calling merely redirect signals.

14. Director states that the vertical services that send no signals to customers are Priority Call, Call Blocker, and Call Trace.

exemption can apply.[15] 78 S.W.3d at 768. Bell's vertical services are not necessary to production of basic telephone service, but *Bell I* instructs that they are additional intangible products that are manufactured by Bell that can qualify for the manufacturing exemption. As discussed above, *Bell I* did not confine Bell's manufacturing merely to signal transformation.

Director argues, however, that this Court's holding as to intangible vertical services cannot extend to include Bell's vertical *billing* services, which produce a tangible product in the form of billing reports. She argues that vertical billing services [16] equipment should not be exempt because it is not "used directly" in manufacturing Bell's products, but is used merely to bill customers for a product manufactured by other equipment.[17]

Bell's billing services involve the compilation of information in a format requested by customers—electronically, on paper, or on disk or CD—that provides customers information about their use of Bell's basic and vertical services.[18] The billing services, however, are more than the tool by which Bell collects the money it is owed for providing its services. Like Bell's other vertical services, Bell's vertical billing services have independent value to customers who purchase the services and are taxed on that purchase.

If Bell's vertical billing services merely provided the means by which Bell charged its customers for its communication services, they would not qualify for the manufacturing exemption. In this case, however, Bell presented evidence that the vertical billing services themselves are products that are manufactured. *See Int'l Bus. Machs.*, 958 S.W.2d at 557 (organizing information through computer technology is manufacturing; product is an output with a market value, it can be either tangible personal property or a service). The AHC correctly compared Bell's billing services equipment to the computers that were found to qualify for the manufacturing exemption in *DST Systems.*[19]

---

**15.** *Bell I* discussed that vertical services operate similarly to basic telephone service in that "[v]arious electrical signals and data are transported from one telephone, through the network, and received by another telephone [and] [a]long the way, the information is manipulated by computers to provide various services, such as call-waiting or Caller ID." 78 S.W.3d at 765.

**16.** Bell's vertical services related to billing are: Bill Plus, Customer Billing Report, Detailed Billing Local Measured Service, and CABS Bills on Floppy Disks. Bill Plus collects data from the billing system and puts it on a floppy disk provided to the customer on a monthly basis. The customer may also get software that can read the disk and organize it into reports and graphs. Customer Billing Report is a service similar to Bill Plus, but Bell prints the report according to the customer's specifications.

**17.** The accounting category relating to Bell's billing equipment includes mainframe computers that are used in maintaining billing and customer service records, as well as providing the vertical billing services. It also includes licenses for software found at Bell's centralized accounting center that uses and manipulates data from Bell's central office equipment to prepare billing reports.

**18.** Bell's central office switch equipment extracts information about customers' calls and use of vertical services that "is manipulated, processed, and organized by other machinery and equipment to produce a variety of information based products which [Bell] sells to retail customers." The information extracted by the switch equipment is used to determine charges and that data is stored in a computer until the customer's billing day, at which point the information is sent to the billing department to generate billing services such as Bill Plus and customer billing reports.

**19.** The AHC stated:

[Bell's billing services] computers manipulate data from the central office switch; thus, their function is integrated with the

43 S.W.3d at 800, 803 (mainframe computers and various other materials used to store, organize, and package for printing information used in transaction confirmation and shareholder reports were used in manufacturing products that were intended to be sold for final use or consumption such that they could be exempted under section 144.030).

Director's arguments challenge only that Bell's vertical services are not manufacturing, which are refuted above. After *Bell I*, all that was left for the AHC to determine was whether Bell's claimed vertical services equipment satisfied the other requirements of section 144.030.2(4) or (5) such that the manufacturing exemption could apply. Director does not argue that the AHC's decision exempting Bell's vertical services equipment is in error as to these other requirements. As such, the AHC did not err in finding that Bell's vertical services equipment is exempt from sales and use tax.

### E. Is Bell's transmission equipment "used directly" in manufacturing?

██ Finally, Director argues that the AHC erred in exempting Bell's "interoffice trunking facilities" from use tax because this equipment is not "used directly" in manufacturing, but is merely used to provide transmission service for the manufac-

tured product. Director cites *Utilicorp*, 75 S.W.3d 725, in arguing that the AHC's decision wrongly dissolves the "line between equipment that is used to create a product and equipment that deals with a product once it is created." She argues that this Court should extend the *Utilicorp* holding from electricity transmission to telephone transmission, asserting that Bell's transmission and distribution equipment cannot be exempt. Bell, however, contends that the AHC rightly concluded that *Utilicorp's* holding is confined to the facts in that case and is uniquely applicable to electricity.

The AHC distinguished *Utilicorp* on its facts, highlighting *Utilicorp's* finding that none of the equipment claimed for an exemption in that case was used in generating electricity, but instead was merely delivering the completed, essential product of electricity from the place where it was generated, without changing it. *See Utilicorp*, 75 S.W.3d at 726–27 (there are three distinct stages of providing electricity—generation, transmission, and distribution—and the equipment at issue was used only for transmission and distribution, not generation). The AHC contrasted the telephone system from electricity by determining that, unlike electricity, the telephone system cannot be divided into generation and transmission stages because changes to signals occur at various stages

---

manufacturing function of Bell's system as a whole. In addition, they produce a tangible product in the form of printed billing reports or disks. This is similar to the function of computers at issue in *DST*, 43 S.W.2d[3d] 799, which processed data from the mutual fund industry and produced printed reports. These computers are large mainframe computers that are highly integrated with the rest of Bell's manufacturing plant, as opposed to PCs; we do not suggest that businesses may qualify for manufacturing exemptions by purchasing PCs for office functions such as accounting and customer billing.

While the AHC's conclusion that Bell's vertical services equipment can be exempt is correct, the AHC's holding as to vertical billing services again raises concerns that the AHC attempted to apply the "integrated plant" doctrine without accessing all three of its prongs. In using the "integrated plant" doctrine to determine whether the claimed vertical services equipment is "used directly" in manufacturing a product, the AHC should have considered that the product of vertical services differs from the product of basic telephone service.

in the system, not during one discrete generation phase. The AHC concluded that *Utilicorp* is not applicable in this case because:

> The entire telephone system is necessary to provide the service of connecting the caller to the other party, and that service is not complete until that connection is made and the signals transmitted back and forth during the conversation. Moreover, telephone service is a 'two-way,' interactive product ... and its final form is shaped both by individual choices [of the callers] ... and what features they may choose to use at a particular time. Electricity, in contrast, is complete when it leaves the generator. It is a 'one-way' product, largely unaffected by customer choice or action.

The AHC correctly determined that *Utilicorp* does not control this case. Bell's telephone service is worthless if not transmitted between and among customers. It is not complete at any one stage in the telephone system, but is a product of the entire system. The transmission equipment challenged by Director is "used directly" in manufacturing telephone service in that it satisfies the three-prong test of the "integrated plant" doctrine. The transmission equipment is necessary for the production of telephone service in that it enables signals to be carried appreciable distances; the equipment is close, physically and causally, to the finished product of telephone service; and it operates harmoniously with Bell's other exempt equipment in an integrated and synchronized system. The production of telephone service illustrates the "integrated plant" doctrine's concern that " '[i]t is not practical to divide [the] plant into 'distinct' stages' " and " '[t]he words 'directly and exclusively' should not be construed to require the division into theoretically distinct stages of what is in fact continuous and indivisible.' "

*Floyd Charcoal,* 599 S.W.2d at 177 (quoting *Niagara,* 144 N.Y.S.2d at 461–62).

The AHC did not err in exempting Bell's transmission and distribution equipment.

## V. Conclusion

For the foregoing reasons, the AHC's decision in affirmed in part and reversed in part, and the cause is remanded.

PRICE, TEITELMAN, LIMBAUGH, and WHITE, JJ., concur.

STITH, J., concurs in part and dissents in part in separate opinion filed.

WOLFF, C.J., concurs in opinion of STITH, J.

LAURA DENVIR STITH, Judge, concurring in part and dissenting in part.

I disagree with the conclusion of the principal opinion that machinery and equipment used by Bell in its telephone transmission services are used directly in "manufacturing" and thereby qualify for the use tax exemption set out in sections 144.030.2(4) and (5). As this Court noted in its decision on prior appeal of this case:

> Over the last few decades, the growth of modern information and communication technologies has challenged lawmakers and courts to keep pace with modern industry. One area of specific difficulty in Missouri has been the application of the manufacturing sales and use tax exemptions to intangible products or services. Two somewhat interrelated issues, the definitions of "product" and "manufacturing", have been at the heart of this jurisprudence.

*Southwestern Bell Telephone Co. v. Director of Revenue,* 78 S.W.3d 763, 766 (Mo. banc 2002) ("*Bell I* ").

It is unfortunate that, in its attempts to "update" the meaning of the word "manufacturing" as used in the manufacturing

sales and use tax provisions, *Bell I* unintentionally gave the word a meaning beyond its dictionary meaning and inconsistent with the intent of the legislature as expressed in the taxing statutes themselves.

The sales and use tax exemption at issue states:

(4) Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, replacing and used for the same purposes as the machinery and equipment replaced by reason of design or product changes, which is purchased for and used directly for manufacturing or fabricating a product which is intended to be sold ultimately for final use or consumption;

(5) Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery and equipment is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption[.]

Secs. 144.030.2(4)-(5), RSMo Supp.1992.

In attempting to apply these provisions to the telecommunications industry, as the principal opinion notes, op. at 228, the taxpayer carries the burden of showing he or she is entitled to an exemption under the statute. *Branson Props. USA, L.P. v. Director of Revenue,* 110 S.W.3d 824, 825 (Mo. banc 2003). Exemptions from taxation are to be strictly construed against the taxpayer, so that any doubt or ambiguity in regard to the applicability of the exemption is resolved in favor of application of the tax. *Id.* Further, in construing the manufacturing exemption:

Courts are instructed by the legislature to take the words in a statute in their plain and ordinary sense. The plain meaning of words, as found in the dictionary, will be used unless the legislature provides a different definition.

*Lincoln Industrial, Inc. v. Director of Revenue,* 51 S.W.3d 462, 465 (Mo. banc 2001) (citations omitted).

The dictionary definition of "manufacturing" does not encompass the services at issue here. To "manufacture" is variously described as, "1: to make (as raw material) into a product suitable for use ... 2a: to make from raw materials by hand or by machinery ... 2b: to produce according to an organized plan and with division of labor." *Webster's Third New International Dictionary 1378 (1993).* It is similarly defined as, "1. a. To make or process (a raw material) into a finished product, esp. by means of a large-scale industrial operation. b. To make or process (a product), esp. with the use of industrial machines. 2. To create, produce, or turn out in a mechanical manner." *The American Heritage Dictionary, 2nd College Edition 764 (1991).*

As is evident, these definitions describe a physical process or one that involves making a product. Even if these definitions can be applied to the making of an intangible product, as this Court has previously held, they cannot be equated with the transmission of a voice over the telephone. Equipment may be used in facilitating the transmission, and the voice may change in form as it travels to its destination, but the voice is not manufactured. It is transmitted. Whether it is transmitted digitally or by a more antiquated process should not affect the fact that equipment used to transmit it is not used directly in manufacturing.

Even were it ambiguous whether transmission of voices could fit within these definitions, the statute would not apply to the telephone services at issue here. As we recognized in another Southwestern Bell case involving a related company, our first obligation would be to turn to the intent of the legislature in enacting the exemption, for:

> If some ambiguity persists in the statute after consulting a dictionary, courts derive meaning from the intent of the legislature. Courts cannot add words to a statute under the auspice of statutory construction.

*Southwestern Bell Yellow Pages, Inc. v. Director of Revenue,* 94 S.W.3d 388, 390 (Mo. banc 2002) (citations omitted). Given this standard, it is important to determine the purpose for which the legislature enacted this exemption.

While Missouri does not have legislative history that expressly sets out the purpose of the manufacturing exemption, its purpose is apparent from the nature of the exemption itself. As this Court has previously recognized, "These statutes were enacted by the legislature to encourage the production of items ultimately subject to sales tax and to encourage the location and expansion of industry in Missouri." *Concord Publishing House, Inc. v. Director of Revenue,* 916 S.W.2d 186, 190 (Mo. banc 1996). *See also Heidelberg Central, Inc. v. Director of Revenue,* 476 S.W.2d 502, 506 (Mo.1972) (per curiam) ("one purpose of the statute clearly was to promote manufacturing business in the State"). This makes the updating of old plants and equipment more economical and encourages businesses to locate and expand here.

The distance this Court's construction of the word manufacturing has moved from the purposes for which the exemption was enacted is demonstrated by the principal opinion, which states that equipment used to give the company information needed to bill the customer for services, and equipment used to tell the customer that he or she has a call waiting or is being called by a private caller and so forth, is manufacturing. If this follows from the definition of "manufacturing" applied in *Bell I,* then *Bell I* itself was too far down the slippery slope; certainly this Court should not slide further down that slope, as it has here in holding that such services are exempt. The answer, rather, should be to acknowledge our error in *Bell I* and climb back to the original meaning of the manufacturing exemption.

Looked at objectively, in light of the dictionary and common sense meaning of "manufacturing," the fact that the telephone companies change the human voice into data and then transmit it and change it back into voice does not mean that equipment that is used to transmit telephone calls and to tell the caller that they have another call waiting, or who is making a call, or how much they will be billed, is directly used in manufacturing. It is equipment used in *transmitting* a voice, and certainly that equipment is needed the way many activities use technological devices to accomplish their intended purposes—here, to communicate to persons not within earshot. But, exempting such equipment from the use tax will not serve any of the purposes to be served by the statute—it will not encourage the location of jobs or factories here, it will not encourage the updating of equipment and so avoid the phasing out of jobs to other locations with newer plants,[1] for the plain

---

1. I also disagree that the "manufacture" of the telephone service can be considered to take place at an "integrated plant," as it, in fact, takes place in various parts at numerous locations, including at its customers' homes,

fact is that transmitting voices over the telephone does not require manufacturing the voice.

The legislature can, of course, enact a statute exempting the telecommunications industry from tax on the equipment it uses to transmit calls, print bills, and offer other services, if it so chooses. It has not yet done so, however, and it is not appropriate for this Court to effectively do so for it by expanding the definition of "manufacturing" so as to encompass industries that could not have been intended to be included within its compass when the legislature enacted the manufacturing exemption.

The machinery and equipment at issue here were not directly used in manufacturing, as required for the manufacturing exemption to apply. Accordingly, I would reverse so much of the decision as applies the exemption. I concur in the portion of the principal opinion that finds that pay telephone equipment is not exempt.

which are in no way part of an "integrated