**AMERICAN AIRLINES, INC., Appellant,**

v.

**DIRECTOR OF REVENUE, Respondent.**

No. SC 92314.

Supreme Court of Missouri, En Banc.

Jan. 8, 2013.

James W. Erwin, Janette M. Lohman, Thompson Coburn LLP, St. Louis, for American Airlines.

Deputy Solicitor General, Jeremiah J. Morgan, Attorney General's Office, Jefferson City, for the Director.

ZEL M. FISCHER, Judge.

American Airlines submitted a request to the director of revenue for a refund of $5,179,361.62 in sales tax it alleges it overpaid between October 1, 2004, and September 30, 2007. The director denied American's request. American then filed a complaint with the administrative hearing commission. The commission decided American was not entitled to a refund.

On appeal, American asserts that its sales of aviation jet fuel to two of its contractors were not subject to taxation under § 144.020,[1] because they did not constitute "sales at retail" as defined by § 144.010.1(11).[2] American asserts that it never transferred title or ownership of the fuel to the purchasers because it restricted the use of the purchased fuel so as to exercise dominion and control over it.

The record, viewed as a whole, supports the factual determination that, upon delivery of the fuel, American transferred title and ownership to its contractors. American did not sufficiently restrict the use of the purchased fuel as to exercise dominion and control over it. Further, the agreements between American and its contractors do not demonstrate any intention that title or ownership would remain with American after delivery of the purchased fuel. Therefore, the transactions constitute "sales at retail" and are subject to taxation under § 144.020. The decision of the administrative hearing commission is affirmed.

**Factual and Procedural Background**

American Airlines, through its parent company AMR Corporation, entered into "Air Services Agreements" with two regional airlines operating out of St. Louis: Trans–States Airlines, Inc. and Chautauqua Airlines, Inc. Under these Air Services Agreements, Chautauqua and Trans–States agreed to operate flights for American under the AmericanConnection brand name. These flights provided regional connections to and from St. Louis. Chautauqua and Trans–States were, under the terms of the agreement, independent contractors for all purposes, assumed all risk of financial losses resulting from the provision of AmericanConnection flights, and were not agents of American or AMR. Similarly, Chautauqua and Trans–States were responsible for all costs incurred in providing the AmericanConnection flights unless expressly provided for in the Air Services Agreements.

The Air Services Agreements required Chautauqua and Trans–States to use only American approved branding and colors on all AmericanConnection flights. Chautauqua and Trans–States were required to use the AmericanConnection brand, colors, and designs on all aircraft and ground equipment used for AmericanConnection flights. They were required to use the AmericanConnection brand, colors, and designs on all signage at the airport ticket counters and gates used for AmericanConnection flights and American approved uniforms for all employees with a direct

---

1. All references to statutes are to RSMo Supp. 2011, unless otherwise noted.

2. During the relevant period, "sale at retail" was defined in § 144.010.1(10), RSMo Supp. 2005. The provision has since been renumbered, but the language is identical.

connection to AmericanConnection flights. They were required to use the American-Connection brand in all advertising materials, use the AmericanConnection or American reservation system for their AmericanConnection flights, and use American's customer service guidelines on AmericanConnection routes. Chautauqua and Trans–States were prohibited from using the aircraft designated for AmericanConnection flights on any other routes and were prohibited from operating any flights for other carriers on routes that competed with the AmericanConnection routes.

The Air Services Agreements were known in the industry as "wet leases." In addition to contracting for the aircraft used on the AmericanConnection flights, under the "wet leases," American contracted for the services of the personnel who operated the aircraft. American was responsible for scheduling the AmericanConnection flights, pricing AmericanConnection flights, and advertising and promoting the AmericanConnection flights. All tickets were issued under the American name and printed on approved American Airlines ticket stock.

American compensated Chautauqua and Trans–States by paying them an agreed-upon fixed rate per "block hour" flown. A "block hour" was defined in the Air Services Agreements as "that time when an aircraft moves under its own power for the purpose of flight and ends when the aircraft comes to rest after landing." The block hour compensation structure was based on a contemplated aviation jet fuel price of $0.85 per gallon in the Chautauqua contract and $1.05 per gallon in the Trans–States contract. Pursuant to the Air Services Agreement, whenever the price of fuel exceeded the contemplated costs, American would reimburse Chautauqua and Trans–States for the price difference on a monthly basis. To the extent that the price of fuel was less than the contemplated cost, the difference would be credited to amounts due to Chautauqua and Trans–States under the Air Services Agreements.

The Air Services Agreements did not require American to sell fuel to Chautauqua or Trans–States and did not require either contractor to purchase its fuel from American. Chautauqua and Trans–States were free to purchase fuel from any source. The Air Services Agreements allowed American to bid on fuel provision services, and Chautauqua and Trans–States agreed to accept American's bid if competitively priced.

From October 1, 2004, through September 30, 2007, American purchased aviation jet fuel from Conoco Phillips and Sunoco. During this period, American paid Missouri state use tax to these vendors on all fuel it purchased until it paid state use tax on the fuel aggregating to $1.5 million, which is the state statutory cap for sales and use tax paid on aviation jet fuel. Section 144.805. After reaching this cap each year, American presented each of its vendors with a Missouri exemption certificate. For the remainder of each year, American paid no additional Missouri state use tax to its vendors. American reached the statutory cap each year.

On October 1, 2004, pursuant to an oral contract, Chautauqua and Trans–States began purchasing fuel from American. American could provide fuel at a lower cost than Chautauqua and Trans–States could purchase it from other suppliers because American bought fuel at a bulk rate, not available to Chautauqua and Trans–States, and then sold them the fuel at cost. American directed its vendors to deposit the fuel Chautauqua and Trans–States purchased directly into planes owned by Chautauqua and Trans–States. Each month, American charged Chautauqua and

Trans–States the full price of the fuel deposited into their planes. Chautauqua and Trans–States orally agreed with American that all fuel purchased from American would be used only on AmericanConnection flights.

From October 1, 2004, to September 30, 2007, American charged Chautauqua and Trans–States sales tax on their purchases of fuel and remitted the collected tax to the Missouri Department of Revenue. During the relevant period, the cost of fuel always exceeded the amounts contemplated in the Air Services Agreements. As a result, American reimbursed Chautauqua and Trans–States for the amount above the cost contemplated by the agreements. The amounts reimbursed to Chautauqua and Trans–States included the entire amount of Missouri state and local sales tax collected by American—and remitted to the department of revenue—from Chautauqua and Trans–States on all sales of fuel from October 1, 2004, through September 30, 2007.

In February 2008, American filed a sales tax refund claim with the director of revenue, requesting a refund of $5,179,361.62 in sales tax that it had collected from Chautauqua and Trans–States and remitted to the director from October 1, 2004, to September 30, 2007. On March 20, 2008, the director issued a final decision denying American's claim for a refund. Following the denial, American filed a complaint with the administrative hearing commission. On January 6, 2012, the commission issued its decision that American was not entitled to a refund, finding that the sales of fuel to Chautauqua and Trans–States were sales at retail under § 144.010.1(11) and did not qualify for the sales tax exemption under § 144.805. Because this case involves the construction of a revenue law of the state of Missouri, this Court has jurisdiction. Mo. Const. art. V, § 3.

## Standard of Review

The commission's interpretation of revenue laws is reviewed *de novo. Sw. Bell Tele. Co. v. Dir. of Revenue,* 182 S.W.3d 226, 228 (Mo. banc 2005). "The [commission's] factual determinations will be upheld if the law supports them and, after reviewing the whole record, there is substantial evidence that supports them." *Id.*

"The burden of proving that a sale of tangible personal property, services, substances or things was not a sale at retail shall be upon the person who made the sale...." Section 144.210. The taxpayer bears the burden of showing they are entitled to a tax exemption. *Sw. Bell Tele.,* 182 S.W.3d at 228. "Exemptions from taxation are to be strictly construed against the taxpayer, and any doubt is resolved in favor of application of the tax." *Id.*

## Analysis

American argues that the commission erred in finding that the sales of fuel constituted a sale at retail. American asserts that it never transferred title or ownership of the fuel to Chautauqua and Trans–States because American, at all times, maintained complete control over the fuel.

Section 144.020.1(1) levies a four percent sales tax on every sale at retail of tangible personal property conducted in the state of Missouri, with certain specified exceptions. A "sale at retail" is defined as "any transfer made by any person engaged in business as defined herein of the ownership of, or title to, tangible personal property to the purchaser, for use and consumption and not for resale in any form as tangible personal property, for a valuable consideration." § 144.010(11). "The tax-

able event is the passage of title or ownership." *Buchholz Mortuaries, Inc. v. Dir. of Revenue,* 113 S.W.3d 192, 194 (Mo. banc 2003). The decisive issue before this Court is whether American transferred title or ownership of the fuel to Chautauqua and Trans–States.[3]

In the typical transaction, a purchaser of tangible personal property pays money, or some other valuable consideration, and receives title and ownership of property. "Title and ownership are usually, but not always, acquired simultaneously by the purchaser." *Id.* "Passage of title or ownership ordinarily occurs upon delivery, unless otherwise agreed by the parties." *Ovid Bell Press, Inc. v. Dir. of Revenue,* 45 S.W.3d 880, 885 (Mo. banc 2001) (citing *Kurtz Concrete, Inc. v. Spradling,* 560 S.W.2d 858, 861–62 (Mo. banc 1978)). "The key is the intent of the parties, as evidenced by all relevant facts, including custom or usage of trade." *Id.* "Ownership is the right to exercise dominion or control over a thing." *Olin Corp. v. Dir. of Revenue,* 945 S.W.2d 442, 444 (Mo. banc 1997).

Despite the fact that American, through its vendors, delivered fuel to Chautauqua and Trans–States and charged Chautauqua and Trans–States for the fuel, American asserts that the transaction was not a "sale at retail." Despite American's delivery of fuel to Chautauqua and Trans–States, which in turn consumed the fuel in the operation of their business, American argues that, through its Air Services Agreements and its oral contract regarding the sale of fuel, American never actually transferred title or ownership of the fuel. Except for the agreement to use the fuel only on AmericanConnection routes, American's transactions with Chautauqua and Trans–States were identical to transactions with any other supplier of fuel.

American argues that, under this Court's precedent in *Olin,* it retained sufficient "dominion and control" over the fuel sold to Chautauqua and Trans–States as to maintain ownership. In *Olin,* the Olin Corporation sought a refund of sales tax it paid on purchases of tangible personal property in the performance of its contract with the United States. *Olin,* 945 S.W.2d at 443. Olin operated an ammunition plant for the government in exchange for an annual fee plus reimbursement of the plant operating costs. *Id.* at 443. When purchasing materials required to operate the plant, Olin used purchase orders indicating that title to the purchased property was to pass directly from the seller to the government upon delivery of the property. *Id.* at 443. The contract between Olin and the government incorporated numerous provisions of the federal acquisition regulations, one of which provided that "title to the property purchased by Olin shall vest in the government upon the vendor's delivery of such property." *Id.* Strict contract specifications limited Olin's ability to use the property in any manner inconsistent with those specifications. *Id.* at 444. The contract included detailed and comprehensive provisions on the acquisition, storage, consumption, utilization, maintenance, and disposition of the property. *Id.* Under the contract, the government had absolute discretion in the utilization of the purchased property, including "how, where, and when the property was to be used." *Id.* Based on the foregoing, this Court held that no sale at retail occurred as to Olin because neither title nor ownership of the property transferred to Olin. *Id.* Title did not transfer to Olin based on the express agreement

---

**3.** There was no claim for refund based on the argument that the fuel was originally purchased for resale. Section 144.010(11).

of the parties. *Id.* at 443. Ownership did not transfer because Olin did not "exercise the necessary dominion or control over the property to have acquired ownership of the property." *Id.* at 444.[4]

American did not exercise the same degree of control over the fuel as did the government in *Olin.* American asserts that it exercised absolute discretion over "how, when, and where" the fuel could be used because it limited use of the fuel to only AmericanConnection flights, controlled branding, scheduled the flights, selected the type of aircraft to be used, and controlled aspects of flight operations. These limitations are wholly unlike the contracts at issue in *Olin,* which included "detailed and comprehensive provisions on the acquisition, storage, consumption, utilization, maintenance and disposition of the property." *Id.* at 444. The limitations concerning branding, ticketing, scheduling, aircraft selection, and flight operation do not give American *any* dominion or control as to the *use of fuel.* They merely indicate that Chautauqua and Trans–States were contractually obligated to perform the flights in a specified manner. Moreover, these limitations would have applied whether Chautauqua and Trans–States purchased fuel from American or any other supplier.

The only provision in the agreements specifically concerning the use of fuel was the oral agreement stating that the fuel was to be used in planes designated for AmericanConnection routes. In all other respects, the fuel sales transaction is exactly the same as if Chautauqua and Trans–States had purchased the fuel from any other supplier.[5] This limitation did not give American "dominion or control" over the fuel. It merely serves to limit how much fuel could be purchased to the amount that would directly benefit American. Furthermore, unlike in *Olin,* here there was no explicit agreement that legal title to or ownership of the fuel would remain in American or would transfer back to American upon purchase by Chautauqua and Trans–States.

Moreover, the agreements here demonstrate that the parties intended for title and ownership of fuel to transfer to Chautauqua and Trans–States. "Passage of title or ownership ordinarily occurs upon delivery, unless otherwise agreed by the parties." *Ovid Bell Press,* 45 S.W.3d at 885. "The key is the intent of the parties, as evidenced by all relevant facts, including custom or usage of trade." *Id.* The Air Services Agreements left it up to Chautauqua and Trans–States to purchase fuel for all AmericanConnection flights. All responsibilities for fueling and fuel services were placed on Chautauqua and Trans–States. The Air Services Agreements did not require American to provide fuel for the AmericanConnection flights, nor did they require Chautauqua or Trans–States to purchase fuel from American. The Air Services Agreements put the risk of financial losses resulting from the provision of AmericanConnection flights on Chautauqua and Trans–States. These agreements did not contemplate that

---

**4.** The Court did note, however, that title and ownership transferred to the government because the government took control of the property, and there was a potentially taxable transaction except "Missouri cannot tax the federal government." *Olin,* 945 S.W.2d at 444 n. 1.

**5.** For instance, American points out that it reimbursed Chautauqua and Trans–States for

the cost of fuel through either "block hour" payments or the agreement to reimburse fuel above the assumed cost per gallon. But this would have been true regardless of where Chautauqua and Trans–States purchased their fuel and, thus, has no effect on the analysis of whether American exercised absolute discretion over the fuel.

American would maintain, receive, or keep title to any fuel purchased for the AmericanConnection flights.

That the Air Services Agreements contemplated that Chautauqua and Trans–States would purchase their fuel from another source is of particular importance in determining the intent of the parties. If Chautauqua and Trans–States purchased fuel from another supplier, American would not be able to claim title to that fuel by nature of the Air Services Agreements, which expressly contemplate the purchase of fuel from another company. This is so even though all the same restrictions concerning American approved uniforms, logos, and equipment would apply. Contrary to American's argument, these restrictions were not intended to ensure that American retained title and ownership of the fuel purchased by Chautauqua and Trans–States.

The significant relevant restriction is Chautauqua's and Trans–States' oral agreement to use the fuel only on AmericanConnection routes. But this significant restriction does not give American complete dominion or control over the fuel, and it does not demonstrate the intent that American would retain ownership of the fuel. Rather, it serves to limit the amount of fuel Chautauqua and Trans–States could purchase from American to the amount that would directly benefit American. It is telling that, as the commission noted, the record and the agreements between the parties do not indicate that American could have required Chautauqua or Trans–States to return the fuel if any fuel remained. Nor does the record indicate that American was entitled to retrieve fuel from Chautauqua or Trans–States if it so desired. The record, viewed as a whole, clearly demonstrates that, once the fuel was delivered to Chautauqua and Trans–States, it was under their control.

The agreements and contract between American and the AmericanConnection carriers articulate that American's intent was to reduce its own operating costs. American began to sell fuel to Chautauqua and Trans–States because it could do so at a lower rate than any other supplier. Because the Air Services Agreements required that American reimburse Chautauqua and Trans–States for the price of fuel above $0.85 or $1.05 per gallon, it was in American's best interest to ensure that Chautauqua and Trans–States purchased fuel as inexpensively as possible. American was only responsible for fuel prices on AmericanConnection flights, so it conditioned its sale of fuel to Chautauqua and Trans–States on their use of the fuel only in planes designated for AmericanConnection routes. These agreements demonstrate American's justifiable desire to keep its operating costs as low as possible, but, as the commission concluded, they do not prove that the parties intended for American to retain title or ownership of fuel purchased by Chautauqua and Trans–States.

### Conclusion

Reviewing the whole record, this Court concludes that the evidence supports the commission's finding that American transferred title and ownership of the fuel to Chautauqua and Trans–States. The transactions at issue here were no different from a sale of fuel from any other vendor except that Chautauqua and Trans–States orally agreed to use the fuel only for AmericanConnection flights. Therefore, the sales to Chautauqua and Trans–States constituted sales at retail and were subject to taxation under § 144.020. The decision of the commission is affirmed.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, STITH and DRAPER, JJ., and NEILL, Sp.J., concur.

WILSON, J., not participating.